STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES BEARD, DEFENDANT-APPELLANT.

Argued June 7, 1954—Decided June 21, 1954.

*Mr. Warren C. Douglas* argued the cause for appellant (*Mr. Elmer Bertman*, attorney).

*Mr. Robert Burk Johnson*, Assistant County Prosecutor, argued the cause for the State (*Mr. Mitchell H. Cohen*, County Prosecutor, attorney).

The opinion of the court was delivered by

WACHENFELD, J. The body of the defendant's mother was found lying in high bushes about 25 feet from the edge of Hampton Road in Delaware Township on the morning of July 3, 1953. She was still alive but died shortly after being taken to Cooper Hospital, where emergency treatments were unsuccessfully attempted.

Death was caused by multiple fractures of the skull, multiple fractures of the mandible, subarachnoid hemorrhage of the brain, and shock. The wounds were estimated to have been inflicted approximately between 10:49 P. M. on July 2, 1953 and 12:49 A. M. on July 3, 1953. They were caused by a relatively sharp and heavy instrument.

No suspicion was lodged against the deceased's son, the defendant, but he was initially questioned in a routine manner concerning his mother's activities. In response to questions as to when he had seen his mother last, he replied on Wednesday night, July 1, about 9:30 P. M. He made the same statement to his fiancee, Marion Boyd, in whose home he had been residing. Beard told another witness he did not see his mother on Thursday, the day of the felonious assault.

When those in authority investigating the case came upon corroborated information to the contrary, that the defendant had been seen with his mother on the day she was fatally beaten, the finger of suspicion moved in his direction.

Marion Boyd, the defendant's fiancee, whom he had arranged to marry on July 11, 1953, was questioned several times by the police and informed them the defendant had used her mother's car on Thursday, July 2, returning home about 11:30 P. M. A tire iron, ordinarily used to open the trunk because the lock was faulty and which was usually on the back or front seat of the car, was missing, its absence first being noticed when Miss Boyd was interrogated. The iron was 24 inches long, 2 inches wide and a quarter of an inch thick.

The defendant was detained in custody and during his interrogation inquired about Marion Boyd, asserting she had nothing to do with the alleged offense. He wanted to see her, which request was granted, and she pleaded with him to tell the truth if he knew anything about the matter. After a court stenographer was summoned, he was examined further, the questions and answers being taken down stenographically.

In this statement the defendant admitted he was with his mother on Thursday, July 2. He stopped for gas; he drove to Swedesboro; he was going to borrow money from her. She nagged him about his girl. He returned from Swedesboro to Camden and then drove to Merchantville. Further on he stopped the car, got out, as did his mother, who stood outside the car while he was in the fields. Beard walked back to the car, picked up a piece of iron lying on the seat, walked around to the side where his mother was standing, and hit her about three times. He had made up his mind after a few drinks to strike her. He admitted knowing his mother would not be at the hospital when he inquired for her earlier Friday morning prior to her admittance in a critical condition. He acknowledged having reported her missing to the detective bureau when he knew she was not.

After this statement was taken, the defendant again saw his fiancee alone, when she said to him, "Why on earth would you do a thing like this?" He replied, "I am sorry it had to be this way." This conversation was not contradicted.

The defendant was then taken to the scene of the crime, together with Captain Dube, Sergeant McDonald, Captain McKeone and the stenographer, where he revealed the location of the offense. Another statement was taken stenographically, in which the defendant identified the spot at which he had stopped the car, pointing out that when he hit his mother she was "out where the car is parked." He indicated where he threw the iron after he had used it, and covered a number of other details of no considerable importance except as they confirmed his original statement in the over-all legitimate inferences to be drawn therefrom.

When further questioning was attempted on Sunday, Beard refused to answer, saying, "There ain't nothing I can say to you that can help me * * * Take me out and shoot me, kill me * * * I ain't going to say any more."

The pants, shoes and glasses which the defendant wore on the evening in question had blood stains on them. An expert chemist and toxicologist testified the blood stain on the pants was Type O, the blood in the soil at the scene of the crime being the same type, as was the blood of the deceased, although about 46% of the people have that type blood, O. A comparison made between the soil on the defendant's shoes and the soil at the scene of the crime showed them to be identical.

The trial consumed seven days and the jury returned a verdict of murder in the first degree. From the death sentence imposed by reason of the verdict, the defendant appeals.

The court erred, it is said, in admitting over objection two statements made by the defendant on July 4, 1953.

The record evidenced that Marion Boyd's mother's car had been used by the defendant at the time of the crime. His apprehension and concern about his fiancee by reason of this fact, plus the promise made by the police officer "to turn her loose," it is urged, "nullifies the voluntariness of the statements made" because they were induced by the promise and thus rendered unreliable.

The contention is this "promise" was made "to encourage a fabricated and synthetic confession," and it is insisted the

statements were "testimonially untrustworthy and should not have been admitted by the trial court; that it was prejudicial error and an abuse of discretion for the trial court to permit their admission."

█ The admission of the statements is sustainable on several grounds. Firstly, in reference to the alleged promise to release Miss Boyd, the record shows Captain Dube testified contrary to the defendant. He said: "I didn't tell him that * * * I told him, 'I will let you see and talk to her if you tell me the truth and if after hearing your story I am satisfied she didn't have anything to do with it she will be out.' "

This cannot be construed as an inducement or a promise but is rather a statement of a customary police procedure in a criminal prosecution, the truth and propriety of which are well established and can hardly be controverted.

The same witness emphatically denied that any "promises direct or indirect" were made to the defendant.

█ The primary inquiry in determining the admissibility of a statement made by the accused is whether it was voluntary. *Roesel v. State*, 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Young*, 67 *N. J. L.* 223 (*E. & A.* 1901); *State v. Hand*, 71 *N. J. L.* 137 (*Sup. Ct.* 1904); *State v. Foulds*, 127 *N. J. L.* 336 (*E. & A.* 1941); *State v. Cole*, 136 *N. J. L.* 606 (*E. & A.* 1947), *certiorari* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773, rehearing denied 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782; *State v. Pierce*, 4 *N. J.* 252 (1950); *State v. Bunk*, 4 *N. J.* 461 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615; *State v. Grillo*, 11 *N. J.* 173 (1952), *certiorari* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391; *State v. Vaszorich*, 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400.

█ With the exception of *State v. Hand, supra*, which did not touch upon the problem, these same decisions are to the effect that whether a statement of confession is voluntary depends upon the facts in each case, and the determination

of the trial court will not as a rule be disturbed on appeal where there is sufficient evidence to support it.

The principles as here enunciated were recently affirmed by this court in *State v. Walker* (decided May 30, 1954), 15 *N. J.* 485 (1954).

Secondly, the defendant dispelled any possibility of a false confession. His only contention was that "they would turn her loose if I answered the questions," the fair inference being, we think, he would answer the questions truthfully, not falsely.

The problem encountered is similar to the one disposed of in *State v. Young*, 97 *N. J. L.* 501 (*E. & A.* 1922), where the Court of Errors and Appeals observed: "He [defendant] was not advised to confess guilt, but to tell the truth."

Thirdly, at the conclusion of the inquiry by the court to determine the voluntariness and admissibility of the confessions, the record conclusively shows the defendant's only assertion was that he could not remember making a confession. His counsel said:

"I want to explain my position, if the court please. This is exactly what the defendant has related to me from the first time I spoke to the defendant concerning this case up and until the present time. The defendant has, at all times, denied to me that he remembers ever making any confession, or any statement, if the court please. Under the circumstances, I felt it my duty, as having been appointed by the court, to put the defendant on the stand and let him explain his position in the best manner that he could, and that is all the testimony I have."

 Fourthly, a confession induced by a promise is not rendered inadmissible unless the promise or hope excited relates to some benefit to be derived by the prisoner in the criminal prosecution.

"It would be received though it were induced by a promise of some collateral benefit or boon, no hope or favor being held out in respect to the criminal charge against him." *Roesel v. State, supra; State v. Kwiatkowski*, 83 *N. J. L.* 650 (*E. & A.* 1912) ; *State v. Noel*, 102 *N. J. L.* 659 (*E. & A.* 1926).

In *State v. Pierce, supra,* a reversal was asked because the defendant was induced to make a confession by a threat "to bring his mother to the police station and interrogate her." We held:

"But giving it its full worth, it merely became a question of fact to be considered by the trial court and jury in determining whether the confession made was voluntary and the weight to be given to it. The finding there made will not be disturbed on appeal if there is competent evidence to support it."

The confessions were properly admitted.

Nor is there, upon the facts presented with respect to the confessions, any semblance of trespass on the principles of fundamental fairness essential to the very concept of justice as embodied in the 14th Amendment of the Federal Constitution. The law and its applicability are fully set forth and analyzed in detail in *State v. Cooper,* 10 *N. J.* 532 (1952).

Next it is said the trial court committed error in admitting the testimony of John Brady, a chemist and toxicologist, to the effect that the trousers, shoes and eyeglasses which the defendant admittedly wore on the day of the murder contained human blood stains, Type O.

To evaluate the equation fully, it must be remembered there is proof in the record that the deceased had Type O blood and that the same type of blood was found in the soil at the scene of the crime. The inference is quite obvious, but the prisoner contends to arrive at it the jury would have to ignore equally probable inferences which the State should have but did not by testimony rule out—for instance, that the blood might have gotten on the trousers days before the attack and gone unnoticed, or that it might have been the defendant's own blood, concluding: "The proffered testimony did not even probably by permissible inference tend to establish the facts the State sought circumstantially to prove."

We cannot subscribe to this theory. No one circumstance standing alone would be sufficient to prove the defendant guilty of the crime laid against him, but each fact, taken in

connection with others as constituting a chain of circumstances tending to corroborate the State's case and to support the inference that the accused was the person who committed the crime, was admissible in evidence. Additionally, in *Morton v. U. S., 79 U. S. App. D. C.* 329, 147 *F. 2d* 28 (*C. A. D. C.* 1945), the court ruled the objection made by the defendant to blood tests and various tests related to them is applicable to the weight of the evidence and not its admissibility.

The blood stains were a link in the chain of evidence forged by the State and were entitled to be weighed, with the other evidence presented, by the jury in arriving at its conclusion.

██ It is further urged as ground for reversal that error was committed by the trial court in permitting the State to call seven witnesses in rebuttal at the conclusion of the defendant's case. They testified generally as to seeing the defendant where he said he had not been.

The admission of such testimony and the order of procedure are matters resting entirely within the sound discretion of the trial judge. Whether testimony by the State should be received after the defense has closed is likewise to be determind by the presiding judge. *State v. Napolitano,* 95 *N. J. L.* 546 (*E. & A.* 1921); *State v. Mohr,* 99 *N. J. L.* 124 (*E. & A.* 1923); *State v. Landecker,* 100 *N. J. L.* 195 (*Sup. Ct.* 1924), affirmed 103 *N. J. L.* 716 (*E. & A.* 1927); *State v. Genese,* 102 *N. J. L.* 134 (*E. & A.* 1925); *State v. Dolbow,* 117 *N. J. L.* 560 (*E. & A.* 1937).

Lastly, the defendant suggests a motion made at the close of the State's case and renewed at the end of the entire case, to limit the verdict to guilty of murder in the second degree or not guilty, should have been granted, and the verdict rendered by the jury was against the weight of the evidence.

It is conceded the State made out a *prima facie* case by proving the *corpus delicti* and the confession, but the contention is the evidence does not support a first-degree murder verdict. Misstatements and errors in small factual equations are cited, but it is admitted: "Superficial aspects

concerning unimportant details of the confession could be in error without impugning their importance as to the critical feature of the admitted act itself." The argument continues, however, that some of these "superficial mistakes" go even to the importance of the confession because although the prisoner admitted striking his mother on the side of the road, she was found some 25 feet away, and whereas he admitted throwing the weapon across the road, it was never found. The brief dwells at some length upon the motive, or lack of it, for the crime and asserts: "Taken at face value, the confession shows a wanton, unmotivated attack on the defendant's own mother."

But in addition to the *corpus delicti* and the full confessions, there were strong convincing corroborative proof and circumstances justifying beyond doubt the verdict returned by the jury.

The pants, shoes and eyeglasses admittedly worn by the defendant had human blood stains on them corresponding with the blood in the soil at the scene of the murder.

The soil on the defendant's shoes and the soil at the scene of the crime were identical, by scientific proof.

His guilt complex and devastating emotional reactions were effectively registered when he proposed to Captain Dube to let him go out the door and shoot him down because his life was over.

The killing of one's own mother has horror written in its very thought and the circumstances involved, to say the least, are exceptional and lastingly impressive.

The motive might be difficult to divine—was it the nagging because of opposition to his desire to marry the girl in question or his inability to secure his mother's help to finance the contemplated matrimonial venture? But, in any event, considering the weapon used and the facts surrounding the assault itself, there is sufficient evidence of first-degree murder without the proof of motive.

"* * * proof of motive is not an essential element in a conviction of murder in the first degree. If the proved facts established

that the defendant in fact did the killing willfully, that is, with intent to kill * * * and as the result of premeditation and deliberation, thereby implying preconsideration and determination, there is murder in the first degree, no matter what defendant's motive may have been, nor although he in fact had no motive * * * whatsoever." *State v. Ehlers,* 98 *N. J. L.* 236 (*E. & A.* 1922).

See also *State v. Jaggers,* 71 *N. J. L.* 281 (*E. & A.* 1904).

█ It is elementary law that a homicide with a deadly weapon in itself justifies a factual presumption there was an intention to take life. *State v. Maioni,* 78 *N. J. L.* 339 (*E. & A.* 1909); *State v. Jones,* 115 *N. J. L.* 257 (*E. & A.* 1935); *State v. Peterson,* 10 *N. J.* 155 (1952).

█ The weapon used, the time consumed and the circumstances of the killing may support an inference of deliberation and premeditation, and whether the evidence and the conduct of the defendant bespeak an intent to take life is a question of fact to be decided by the jury, whose verdict will not be set aside as against the weight of the evidence except where it clearly appears it was the result of mistake, passion, prejudice or partiality. *State v. Pierce, supra; State v. Goodman,* 9 *N. J.* 569 (1952).

In the instant case, the nature of the attack, the manner of its execution, the isolated location of the crime, the severity, extent and number of the wounds, the weapon used, and the defendant's own version uttered in his confession, amply prove that the killing was willful, deliberate and premeditated.

There is an abundance of evidence direct and circumstantial justifying the jury's verdict.

The charge by the trial court to the jury must have been eminently fair and impartial. It satisfied the defendant's counsel, who had been appointed to represent him, to such an extent that it was not complained of and is not even printed in the record before us.

Our study of the whole case discloses no manifest wrong or legal injury suffered by the defendant.

The judgment is affirmed.

HEHER, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.