IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD 1661-09





JOSE VASQUEZ GONZALES, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRTEENTH COURT OF APPEALS


VICTORIA COUNTY





 Cochran, J., filed a statement concurring in the decision to refuse appellant's
petition for discretionary review in which Johnson, J., joined.



 In his second ground for review, this pro se appellant asserts that the court of appeals
erred in holding that the trial court correctly admitted expert testimony by an FBI analyst 
concerning comparative bullet lead analysis (CBLA). During the Daubert hearing at
appellant's trial in 2003, appellant's attorney cited relevant critical studies that attacked the
theoretical and methodological validity of the FBI analyst's proposed testimony. The trial
judge, however, relied upon two cases from other jurisdictions that had admitted this type of
expert testimony years before its flaws became apparent to the scientific community. Only
a few months after this 2003 trial, the scientific basis for this expert testimony was largely
discredited by National Research Council (NRC) in a study commissioned by the FBI. (1) The
FBI ended all such comparative bullet lead analysis work and testimony in 2005. (2) Several
recent published cases from other jurisdictions have reversed convictions that had allowed
an FBI analyst to testify to this flawed scientific theory. The FBI is currently trying to
identify all of the cases in which convictions were obtained in reliance on CBLA testimony
so that they can be reviewed. (3) This is one of them.

 Appellant was charged with the murder of a rival gang member. At trial, the State
offered expert testimony from Charles Peters, a long-time FBI analyst, on comparative bullet
lead analysis. The trial court held a Daubert/Kelly (4) hearing in which Mr. Peters was the sole
witness. He stated that he has been doing comparative bullet lead analysis for the FBI since
1975. The FBI is the only entity that has ever done CBLA. By 2003, only two FBI analysts,
Mr. Peters and Mr. Riley, did this work. No one outside the FBI had ever seen their process
or how they arrived at their scientific conclusions. (5) According to Mr. Peters, "We're
basically the only game in town, because of the expense of the analysis and local jurisdictions
only need it on a very limited basis."

 Mr. Peters's opinion, in a nutshell, was that the chemical composition of the bullets
found at the murder scene matched the composition of bullets taken from appellant's
apartment that had been distributed by the American Ammunition Company. He testified
that they were analytically indistinguishable. Therefore, he concluded, "these bullets likely
came from the same source or metal or lead at that manufacture, during the manufacturing
process." In other words, the crime scene bullet came from the defendant's box of
ammunition or another box that was produced from that mill at the same time. In his
opinion, the bullets from the scene "likely" came from defendant's box of ammunition, "but
I always put on the caveat- the many other boxes, it's as likely they were produced at the
same time." Both Mr. Peters and the prosecutor repeatedly implied that the crime-scene
bullet probably came from appellant's box of ammunition because they "matched," and
because American Ammunition was a small manufacturer and distributor of bullets.

 Mr. Peters testified that appellant's box of bullets was "finished" by American
Ammunition, but he thought that the lead bullets themselves were manufactured by CCI-Speer which, he said, is one of the four largest lead bullet manufacturers in the U.S. They
sell and distribute their lead bullets to innumerable smaller manufacturers for finishing (e.g.,
putting on the copper coat, milling, stamping, boxing, and distributing). "They sell this stuff
all over the United States." (6) 

 Appellant's counsel told the trial judge that he had two specific issues to raise with
Mr. Peters: (1) Is the scientific testing and analysis sufficient to establish that two bullets do,
in fact, come from the same "pot of lead"; (8) and (2) If that comparison is possible, then what
does Mr. Peters mean by "same pot of lead," how big of a sample is this, and what does he
know about the manufacturing and distribution process of these particular lead bullets. 
During the Daubert hearing, appellant's counsel confronted Mr. Peters with several then-recent studies that contradicted his theory, methodology, and opinions. One of them, "A
Metallurgical Review of the Interpretation of Bullet Lead Compositional Analysis," was
written by Mr. Peters's former mentor at the FBI, Bill Tobin, and published by Forensic
Science International. (12) Mr. Peters rejected his former mentor's criticisms, although they had
been widely cited in the scientific and legal community. (13) Mr. Peters also downplayed the 
1999 FBI-funded study by the Department of Statistics at Iowa State University-a study that
led one of its principal investigators to conclude that "[t]he leap from a match to equal origin
is enormous and not justified given the available information about bullet lead evidence." (14) 
Similarly, at the time of the 2003 Daubert hearing, appellant's counsel referred Mr. Peters
to the then-pending NRC study. Mr. Peters suggested that the study would validate his
methodology, (15) but, in fact, it did the reverse. (16) He also rejected the criticisms leveled at
CBLA that were being raised by Professor Imwinkelried, a prominent legal scholar on
forensic sciences, evidence, and the criminal justice system, (17) but Mr. Peters did admit that
"the science is evolving." 

 Mr. Peters explained that if two bullets are "analytically indistinguishable" they must
have come from the same lead "melt" at the same factory at the same time. (18) When defense
counsel pointed out that the Iowa State study had expressed concern about the possibility that
bullets from different "melts" might coincidentally match, (19) Mr. Peters said that he had
nothing to do with that study. 

 Next, defense counsel asked about the "Keto" Study in the Journal of Forensic
Science. (20) When defense counsel asked Mr. Peters if that study concluded that "general
bullet lead analysis does not generate individualizing information," Mr. Peters responded,
"It's been some time since I read it. It's a very limited study. . . . And he certainly isn't an
expert in the bullet analysis world." The purport of Mr. Keto's criticism in 1999 was that
even if one could say there was a perfect lead match, and even if one could say that the two
bullets must have been manufactured from the same lead "melt," that tells the factfinder
nothing about the number of bullets made from that "melt" or their distribution throughout
the United States. (21) 

 After hearing Mr. Peters's testimony at the Daubert/Kelly hearing, the trial court ruled
that he could testify before the jury to his expert opinions concerning his comparison between
the crime scene bullets and those found in appellant's apartment. In making that ruling, the
trial judge explicitly relied on two earlier cases, State v. Noel, 723 A.2d 602 (N.J. 1999), and
United States v. Davis, 103 F.3d 660 (8th Cir. 1996), which had both admitted CBLA
evidence as scientifically reliable. During the late 1990's, the major criticisms concerning
CBLA had just begun, so those courts were not yet aware of its potential for scientific
unreliability. (23) In the wake of the NRC Report, published opinions by several state courts
have held that CBLA evidence is scientifically unreliable and, therefore, inadmissible. (24)

 The problem in this case is not that appellant's counsel failed to raise, litigate, or
preserve the right issue-the scientific reliability of Mr. Peters's proposed expert opinion
testimony. He did. Admirably. But the trial record in this direct appeal does not contain all
of the materials necessary to fairly resolve the issue that he preserved. Specifically, the trial
record does not contain (and could not contain because it did not exist at that time) the NRC
Report that defense counsel referred to, (25) as well as the more recent scientific studies and
evidentiary materials that have followed in its wake. 

 Although we may take judicial notice of the recent cases that have reversed
convictions based upon this "flawed science," we generally do not take judicial notice, on
direct appeal, of other scientific or research materials that are not contained within the trial
record. (26) Such "newly available" materials may, of course, be considered in post-conviction
proceedings if they are placed before the trial court. 

 Especially when courts must deal with evolving science in the field of forensic
evidence, judges will find treatises, studies, peer-reviewed articles, and the like helpful only
if they are physically introduced into evidence so that both the trial and appellate courts can
carefully consider the full spectrum of pertinent materials. Further, if those scientific
materials are introduced into evidence, both parties have an opportunity to call witnesses to
discuss whether those materials are generally accepted and relied upon in the pertinent
scientific community. They may also question the source and validity of the data relied upon,
the methodology used, and the conclusions reached by the authors. In sum, they may call
witnesses in support or opposition to the theories, methodologies, and conclusions at issue. 
To ensure that only "good" science is admitted and "bad" science is excluded in our criminal
trials, the parties must shoulder the responsibility of providing and explaining the appropriate
educational materials for judges to make that determination. That was not entirely possible
at the time of this 2003 trial as the science itself was "evolving," but a trial-court review of
the testimony admitted in this case, based upon more recent scientific developments, may
now be both possible and appropriate.

 Thus, because the trial record is incomplete, I concur in the Court's decision to refuse
appellant's petition for discretionary review on direct appeal.


Filed: February 24, 2010


Do Not Publish
1. National Research Council, Committee on Scientific Assessment of Bullet
Lead Elemental Composition Comparison, Forensic Analysis: Weighing Bullet Lead
Evidence (2004) (NRC Report) (available at:
http//www.nap.edu/catalog.php?record_id=10924).
2. The NRC Report was issued in February, 2004; appellant's trial took place in
September, 2003. Nonetheless, appellant's lawyer was aware of the pending report and its
criticism of Mr. Peters's methodology and testimony. The FBI issued a press release
discontinuing its lead bullet analysis on September 1, 2005, slightly more than two months after
the court of appeals issued its opinion in this case. 
3. See Smith v. State, ___ So.3d ___, 2010 WL 21178 (Fla. Dist. Ct. App. Jan. 6, 2010)
(citing "60 Minutes" Report); Paul C. Giannelli, Comparative Bullet Lead Analysis-An Update,
23 Crim. Just. 24, 25 (2008) (noting that The Innocence Network and the NACDL had formed a
task force to work with the FBI to identify and contact defense attorneys and convicts to re-examine cases in which CBLA testimony had been admitted); Jessica D. Gabel & Margaret D.
Wilkinson, Symposium: "Good" Science Gone Bad: How the Criminal Justice System Can
Redress the Impact of Flawed Forensics, 59 Hastings L.J. 1001, 1006 (2008) (stating that FBI's
corrective action "apparently will include a nationwide review of all CBLA-related testimony and
notification to prosecutors so that the courts and defendants can be alerted"); see also "FBI
Reviews Cases Where Flawed Evidence Used," Houston Chronicle (Jan. 18, 2010) (available at
http://www.chron.com/disp/story.mpl/ap/nation/6821348.html) (last visited Jan. 26, 2010)
(noting three convictions, which had been based on CBLA evidence, that had been reversed).
4. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993); Kelly v. State,
824 S.W.2d 568, 573 (Tex. Crim. App. 1992).
5. Mr. Peters testified in front of the jury that some scientists from the National Academy
of Scientists had recently come to his laboratory to observe his technique as they were compiling
their Report for the National Research Council.
6. The NRC Report concluded that too little is known about patterns of the distribution of
ammunition to establish whether bullets from the same compositionally indistinguishable volume
of lead (CIVL) are more or less likely to come from a given box of ammunition: The committee attempted to obtain information on the distribution of ammunition
and bullets in the United States. Such distribution information would assist with
determining the probability of finding a large number of analytically
indistinguishable bullets in one geographic region. Thus, the probability that a
crime scene bullet which matches a suspect's bullet actually came from the
suspect might be vastly different in an isolated small town vs a major
metropolitan area. But, distribution information on bullets and on loaded
ammunition either does not exist or is considered proprietary, and the committee
was unable to assess regional distribution patterns. (7)
7. Id. at 6; See generally, D.H. Kaye, The Current State of Bullet-Lead Evidence, 47
Jurimetrics J. 99 (2006) (reviewing NRC Report, collecting pre- and post-Report cases and
concluding that "[u]ntil there is reason to believe that CIVLity is strongly indicative of a
defendant's association with both bullet-lead samples, the wiser course may be to exclude even
the NRC's sanitized version of CABL testimony"). - 
 - - 
" ' 
 - ' 
 "
8. Mr. Peters testified that he "matches" lead samples by comparing the concentration of
seven different elements (arsenic, antimony, tin, copper, bismuth, silver, and cadmium) in the
bullet lead alloy of both the crime scene and suspect's bullets. (9)
9. Paul Giannelli, Comparative Bullet Lead Analysis, American Bar Association, 23 Crim.
Just. 24, 24 (Summer 2008) (outlining the FBI testing method and noting that "[e]xactly what the
phrase 'analytically indistinguishable' meant was the source of the problem"). 
 "" 
 ' ' 
" " 
"" - (10)
10. Edward J. Imwinkelried & William Tobin, Forensics Symposium: The Use and Misuse
of Forensic Evidence; Comparative Bullet Lead Analysis: Valid Inference or Ipse Dixit?, 28
Okla. City U.L. Rev. 43, 49 (2003). 
 
 
 
 "" "" (11)
11. Id. 
 
 " 
' ' "
12. 127 Forensic Sci. Intl. 174, 182 (2002).
13. The article written by William A. Tobin and Wayne Duerfeldt, How Probative Is
Comparative Bullet Lead Analysis?, concluding that "the current practice of CBLA is
scientifically flawed, and that no scientifically or statistically adequate data exist to support its
foundation," appeared in the American Bar Association's publication, Criminal Justice, in the
Fall of 2002. 17 Crim. Just. 26, 33. At trial, Mr. Peters dismissed Mr. Tobin's work as that of a
turncoat after Mr. Tobin had retired from the FBI. Mr. Tobin's criticisms were ultimately cited
and relied upon in the NRC Report.
14. See Tobin & Duerfeldt at 32 (quoting Professor Alicia L. Carriquiry at Iowa State
University); see generally, Alicia L. Carriquiry, Michael Daniels, Hal S. Stern, Statistical
Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead, Dept. of
Statistics, Iowa State University and Ames Laboratory (May 4, 2000).
15. Mr. Peters testified that "[i]t's my understanding the study has been completed and is
being written up and being printed at this moment and is supposed to be released in October." 
He stated that he did "not believe it is a possibility" that the NRC study would deem his analysis
and testimony unreliable.
16. See note 19 infra. 
17. Edward J. Imwinkelried & William Tobin, Forensics Symposium: The Use and Misuse
of Forensic Evidence; Comparative Bullet Lead Analysis: Valid Inference or Ipse Dixit?, 28
Okla. City U.L. Rev. 43, 49 (2003).
18. The NRC was highly skeptical of this inference. It concluded that the best that could be
said is that they "could have" come from the same lead melt, but there had been insufficient
comparative studies of lead "melts" to see if they are always, sometimes, or never
indistinguishable in their results. NRC Report at 7. In 2003, Professor Imwinkelried and
William Tobin concluded, "There is insufficient data to support any conclusions about the
uniqueness or individuality of each molten source." Imwinkelried, supra, at 51-52 (noting that
"[s]everal factors conspire to make it plausible that by chance, the composition of different
molten sources will be analytically indistinguishable.").
19. See Alicia L. Carriquiry, et al., supra note 10; see also NRC Report at 99 ("The
frequency of coincidentally identical CIVLs is unknown.").
20. See Raymond O. Keto, Analysis and Comparisons of Bullet Leads by Inductively-Coupled Plasma Mass Spectrometry, 44 J. Forensic Sci. 1020, 1026 (1999) ("This data suggests
that when two element signatures match, it is unlikely that the bullets originated from different
sources. The extent of each particular source (i.e., the number of identical boxes by each
manufacturer) and the bullets available in a particular geographic area at a particular time are all
unknown factors.").
21. The NRC Report stated that a single "melt" "can range from . . . as few as 12,000 to as
many as 35 million . . . compared with a total of 9 billion bullets produced each year." (22)
22. NRC Report at 6-7. The NRC Report states, "A conclusion that two bullets came from
the same melt does not justify an expert in further testifying that this fact increases the odds that
the crime bullet came from the defendant." Id. at 102. 
 - " 
 
 " 
23. But see Andre Moenssens, et al., Scientific Evidence in Criminal Cases § 9.07,
at 541 (3d ed. 1986) (noting that elemental lead analysis of bullets to connect a crime scene
bullet with another one is problematic; "[a] flaw, however, in this logic, which may be fatal,
exists in the possibility that the number of bullets manufactured with similar elemental
characteristics by the same manufacturer may be so numerous as to make the likelihood of the
accused's link to the evidence bullet statistically tenuous.").
24. See State v. Behn
, 868 A.2d 329, 331 (N.J. 2005) (finding the technique was "based on
erroneous scientific foundations"); Ragland v. Commonwealth, 191 S.W.3d 569, 580 (Ky. 2006)
("If the FBI Laboratory that produced the CBLA evidence now considers such evidence to be of
insufficient reliability to justify continuing to produce it, a finding by the trial court that the
evidence is both scientifically reliable and relevant would be clearly erroneous."); Clemons v.
State, 896 A.2d 1059, 1070, 1078 (Md. 2006) ("CBLA is not admissible under the Frye-Reed
standard because it is not generally accepted within the scientific community as valid and
reliable. . . . Based on the criticism of the processes and assumptions underlying CBLA, we
determine that the trial court erred in admitting expert testimony based on CBLA because of the
lack of general acceptance of the process in the scientific community."); see also Smith v. State,
___ So.3d ___, 2010 WL 21178 (Fla. Dist. Ct. App. Jan. 6, 2010) (reversing summary denial of
defendant's motion for post-conviction relief on his 1990 conviction based on newly discovered
evidence that the FBI testimony concerning CBLA testimony was scientifically unreliable and
had been "discredited and abandoned"; remanding for further proceedings).
25. National Research Council, Committee on Scientific Assessment of Bullet
Lead Elemental Composition Comparison, Forensic Analysis: Weighing Bullet Lead
Evidence (2004). The NRC Report used the acronym CABL (compositional analysis of bullet
lead) instead of CBLA and includes these findings:


 CABL is sufficiently reliable to support testimony that bullets from the same
compositionally indistinguishable volume of lead (CIVL) are more likely to be
analytically indistinguishable than bullets from different CIVLs. An examiner
may also testify that having CABL evidence that two bullets are analytically
indistinguishable increases the probability that two bullets came from the same
CIVL, versus no evidence of match status.


 Although it has been demonstrated that there are a large number of different
compositionally indistinguishable volumes of lead (CIVLs), there is evidence that
bullets from different CIVLs can sometimes coincidentally be analytically
indistinguishable.


 The available data do not support any statement that a crime bullet came from, or
is likely to have come from, a particular box of ammunition, and references to
"boxes" of ammunition in any form is seriously misleading under Federal Rule of
Evidence 403. Testimony that a crime bullet came from the defendant's box or
from a box manufactured at the same time is also objectionable because it may be
understood as implying a substantial probability that the bullet came from
defendant's box.

Id. at 107.
26. See Hernandez v. State, 116 S.W.3d 26, 31 (Tex. Crim. App. 2003) (although appellate
courts may take judicial notice of other appellate opinions concerning a specific scientific theory
or methodology in evaluating a trial judge's Daubert/Kelly 'gatekeeping' decision, judicial
notice on appeal cannot serve as the sole source of support for a bare trial court record
concerning scientific reliability."). In the present case, the trial record is far from bare, but it
does not contain the single most important scientific material for an appropriate Daubert/Kelly
inquiry into the scientific reliability of CBLA expert testimony--the NRC report.