Shane Layton RAGLAND, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2002–SC–0388–MR, 2003–SC–0084–TG.

Supreme Court of Kentucky.

March 23, 2006.

Rehearing Denied June 15, 2006.

William E. Johnson, J. Guthrie True, Johnson, True & Guarnieri, LLP, Frankfort, Jerry L. Wright, Herren and Adams, Lexington, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Connie Vance Malone, Todd D. Ferguson, Assistant Attorneys General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Appellant, Shane Layton Ragland, was convicted by a Fayette Circuit Court jury of murder and sentenced to thirty years in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting eight claims of reversible error, *viz:* (1) failure to grant Appellant's motion for a

change of venue; (2) admission of expert testimony with respect to the results of comparative bullet lead analysis (CBLA) tests; (3) failure to grant a new trial on the basis of newly discovered evidence that the CBLA expert had knowingly given false testimony at the *Daubert* hearing; (4) failure to suppress evidence obtained pursuant to search warrants; (5) failure to suppress evidence of statements made by Appellant during a custodial interrogation; (6) admission of hearsay statements made by the victim; (7) admission of ballistics evidence with respect to weapons other than the alleged murder weapon; and (8) failure to declare a mistrial when the prosecutor commented on Appellant's failure to testify at trial. We conclude that the admission of the CBLA test results and the expert's opinions about those results require reversal for a new trial. Thus, we need not address the claim relating to venue, which can be renewed prior to retrial. We will address other claims of error because they are likely to recur upon retrial. *Springer v. Commonwealth*, 998 S.W.2d 439, 445 (Ky.1999).

\* \* \* \* \* \*

On the night of July 17, 1994, Trent DiGiuro, a student athlete at the University of Kentucky, was shot in the head and killed as he sat in a chair on the front porch of his residence at 570 Woodland Avenue, Lexington, Kentucky. DiGiuro was celebrating his twenty-first birthday with friends, some of whom were on the porch with him when he was killed. Although one eyewitness heard the shot, no one saw who fired it or from where it was fired. Fragments of the fatal bullet were recovered during the postmortem examination, and a firearms expert concluded that the bullet most likely had been fired from a .243 caliber rifle with a four-groves-and-lands, right-twist barrel pattern. Lexington police found two holes in the ground under some bushes near the corner of Woodland and Columbia Avenues, which could have been caused by a bipod rifle stand. Because the spot provided a clear line of sight to the front porch of DiGiuro's residence, the police surmised that it was the spot from where the shot had been fired. Although numerous leads were followed and at least one suspect was identified, six years elapsed before anyone was charged with the murder.

In January 2000, Aimee Lloyd, Appellant's ex-girlfriend, informed Lexington police officers that Appellant confessed to her in April 1995 that he killed DiGiuro because DiGiuro had caused Appellant to be "blackballed" by his college fraternity three years earlier. According to Lloyd, Appellant showed her the rifle he had used to shoot DiGiuro and later told her that he had hidden the rifle at his mother's residence at 501 Capital Avenue, Frankfort, Kentucky. Lloyd also believed the rifle belonged to Appellant's father and that Appellant may have subsequently returned it to his father's residence at 1469 Old Lawrenceburg Road, Frankfort. Appellant resided part-time at both residences. Lloyd also told the police that during her relationship with Appellant from 1994 to 1996, he and one of his friends engaged in a marijuana-growing operation, including cultivating marijuana on his father's Old Lawrenceburg Road property. Because they had no jurisdiction outside of Lexington, the Lexington police referred the information about the location of the weapon and the marijuana operation to the Kentucky State Police and the Federal Bureau of Investigation (FBI).

On July 12, 2000, FBI Special Agent Gary Miller obtained warrants from a United States Magistrate to search the Frankfort residences of Appellant's parents. On July 13, 2000, Lloyd, pursuant to a ruse and in cooperation with Lexington

police, met Appellant at a bar in Lexington and attempted to engage him in a secretly recorded conversation about the DiGiuro murder. The Commonwealth claims that during that conversation Appellant expressed regret for having murdered DiGiuro. Appellant claimed to the police that he had only expressed regret for having mistreated Lloyd during their previous relationship. The recorded conversation, which prosecutors played for the jury at trial, was arguably ambiguous. On July 14, 2000, Lexington police officers interrogated Appellant at police headquarters while FBI agents executed the search warrants at the Frankfort residences of Appellant's parents. Although Appellant did not confess to the murder of DiGiuro, he made some statements during the interrogation that were inconsistent with other information his interrogators believed to be true.

The search of the 501 Capital Avenue residence recovered a .243 caliber Wetherby Vanguard rifle with three unspent .243 caliber bullets in the chamber. The search of the 1469 Old Lawrenceburg Road residence revealed an ammunition box containing seventeen unspent .243 caliber bullets. A label on the box indicated the Winchester Ammunition Company had manufactured the bullets on April 28, 1994. Kathleen Lundy, a metallurgist employed as a forensic scientist by the FBI, subjected the three bullets found in the Wetherby Vanguard rifle, sixteen of the seventeen bullets found in the ammunition box, and the fragment of the bullet that killed DiGiuro to a comparative bullet lead analysis. She testified at trial that one of the bullets recovered from the rifle and nine of the bullets found in the ammunition box were "analytically indistinguishable" in metallurgical composition from the bullet that killed DiGiuro, a finding she described as "consistent with" the bullets having originated from the same source of molten lead.

Markings on bullets test-fired from the .243 Wetherby Vanguard rifle found at 501 Capital Avenue matched the markings on the murder bullet. Markings on bullets test-fired from three other .243 Wetherby Vanguard rifles manufactured during the same time period as the Ragland rifle did not match those found on the murder bullet. However, the firearms examiner was unable to conclusively say that the Ragland rifle fired the murder bullet because of the degree of fragmentation of the bullet.

# I. COMPARATIVE BULLET LEAD ANALYSIS.

## A. "Daubert" Ruling.

Appellant moved to suppress Lundy's expert opinion that the metallurgical composition of the .243 caliber bullet fragment removed from DiGiuro's body was analytically indistinguishable from one of the three bullets in the rifle found at 501 Capital Avenue and nine of the seventeen bullets in the ammunition box found at 1469 Old Lawrenceburg Road,[1] and that such was consistent with the bullets having originated from the same source, i.e., the same batch of molten lead. Appellant asserts that Lundy's conclusions in that regard are scientifically unreliable. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993); Mitchell v. Commonwealth, 908 S.W.2d 100, 101–02 (Ky.1995) (adopting Daubert in Kentucky), overruled in part on other grounds by Fugate v. Commonwealth, 993 S.W.2d 931, 937 (Ky. 1999). This "gatekeeping" role of the trial court, Daubert, 509 U.S. at 597, 113 S.Ct. at 2798, is designed to banish "junk sci-

---

1. She tested only sixteen of the seventeen bullets from the ammunition box.

ence" evidence from the courtroom, *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir.2002), by requiring a preliminary determination that proffered expert testimony meets the reliability standards of KRE 702. *Mitchell*, 908 S.W.2d at 102.

> Faced with a proffer of scientific testimony, ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796 (footnotes omitted). A finding that the reasoning or methodology is scientifically reliable is reviewed for clear error. *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky.2004). A determination that the evidence will assist the trier of fact is reviewed for abuse of discretion. *Id.*

Lundy testified at the *Daubert* hearing that lead bullets are manufactured primarily from recycled automobile batteries. Most bullet manufacturers purchase their lead in bulk from secondary smelters (recyclers), who crush and melt the batteries, then separate the lead to the extent possible from the other battery contents. The molten lead is then cooled and formed into 60– to 100–pound bricks or ingots, 70– to 125–pound cylindrical billets, or 1,000– to 2,000–pound blocks. Each ingot, billet, or block will inevitably contain traces of arsenic, antimony, tin, bismuth, copper, silver, and/or cadmium—elements in the batteries that did not separate from the lead during the recycling process. Because antimony hardens lead, bullet manufacturers

often specify that the lead they purchase must contain a certain percentage of that element. Otherwise, the manufacturers only require that the percentages of these trace elements (or "impurities") not exceed certain levels. The smelter tests each batch of molten lead as it is poured from its crucible and reports the percentages of impurities to the bullet manufacturer when the product is delivered.

At the bullet manufacturing plant, the manufacturer inserts the lead into an extrusion press that forms it into a "bullet wire" having the diameter of the desired bullets. The wire is chopped into slugs that are then swaged into bullets. The bullets are then plated or placed in a copper jacket before being loaded into cartridges. If the lead is purchased from the smelter in billet form, it can be inserted directly into the extrusion press. However, if it is purchased in ingot or block form, it must be remelted and reformed at the bullet manufacturing plant. When this occurs, the manufacturer will commonly add lead waste or scraps remaining from earlier extrusion, chopping, and swaging processes to the mix, thus changing the percentages of the impurities in that particular batch. Even if the manufacturer buys only billets, it will still remelt lead waste and scraps for reuse.

Because there is no way to know the exact source of the lead used to make a particular bullet, *i.e.*, whether it was melted by a secondary smelter, whether it was remelted from waste and scraps by the manufacturer, or whether each bullet in a box contains lead from the same melt, Lundy does not attempt to trace the origin of each bullet to its source. Instead, she performs a comparative bullet lead analysis (CBLA), using an instrument that measures the percentages of trace elements in a bullet by a methodology known as inductively coupled plasma-atomic emission

spectroscopy, or "ICP." Lundy opined that if the percentages of impurities in two bullets are the same, *i.e.,* "analytically indistinguishable," that fact is "consistent with" the bullets having originated from the same batch of molten lead. Initially, Lundy testified (quoting from her report) that:

> This is consistent with the specimens within each group originating from the same source of bullet lead at the Winchester Ammunition manufacturing plant.
>
> . . . .
>
> These results are typical of what is expected among bullets originating from the same box of cartridges or other boxes of the same manufacturer, caliber and type packaged on or about the same date.

Later, however, she admitted that she could not say conclusively that the murder bullet must have come from the same box of ammunition as the bullets retrieved from the Ragland residences. (In fact, Paul Szabo, an employee of Winchester Ammunition, testified that a box of ammunition contains twenty bullets. In this case, the twenty bullets were accounted for by the seventeen bullets found in the ammunition box and the three bullets found in the rifle retrieved from the Capital Avenue residence, seemingly leaving the murder bullet as one bullet too many.) Lundy never opined that the analytically indistinguishable bullets *did* originate from the same batch of molten lead, though she strongly suggested as much throughout her testimony, *viz:*

> [W]e have seen that bullets that come from the same source of lead will have the same composition, and bullets from different sources of lead have different composition.
>
> And we have studied the production processes within the plants and seen

that you will have bullets of the same composition in a given box or other boxes of that same product that are packaged at the same time . . . .

. . . .

> . . . [Y]ou expect to find bullets of the same composition in a given box or other boxes, but, you know, it's the same type of ammunition that's produced at the same time. That's the—that's where you expect to find compositional similarities.
>
> . . . .
>
> Well, again, that means that from analyzing many boxes of ammunition over the years in many cases in research projects and in many of the cases I've worked there have been multiple boxes with the same packing code, which means they were produced at the same time. And I've seen that you do expect to find the same compositions in these different boxes.

Nonetheless, there were problems with Lundy's testimony at the *Daubert* hearing. She testified that in 1994, Winchester purchased its lead in ingot or block form and remelted it at its plant. At trial, however, she admitted that in 1994, Winchester purchased its lead in billet form and, thus, only remelted lead shavings and scraps at its manufacturing plant. The significance of the difference is that Winchester's furnace has only a 15,000–pound capacity whereas some secondary smelters melt lead in crucibles having up to 200,000–pound capacities. Lundy testified that approximately one million bullets can be manufactured from a 15,000 pound melt. If so, approximately thirteen million bullets can be manufactured from a 200,000 pound melt, significantly increasing the number of bullets that would be analytically indistinguishable—assuming that all melts are homogeneous, a fact that was also disputed.

Lundy also admitted that FBI Laboratory protocol required that she test three 60–milligram samples of each bullet. However, Lundy had previously tested the same murder bullet in 1996 for comparison with bullets obtained from another suspect in this case. When she conducted her tests in 2001 for comparison with the bullets found in the Ragland residences, she first tested five of the Ragland bullets and found none to be analytically indistinguishable from the result of her 1996 test of the murder bullet. Because the FBI Laboratory had obtained a new ICP instrument in the interim between the two tests, Lundy decided to retest the murder bullet. However, the remaining fragment of the murder bullet did not provide enough lead to conform to laboratory protocol. Thus, she could only test three 30–milligram samples instead of three 60–milligram samples. She insisted that this departure from protocol did not affect the validity of the test.

Appellant's expert, William A. Tobin, is a retired FBI agent and former "de facto chief metallurgist" of the FBI Laboratory. He admitted that ICP is a scientifically accepted method of determining the percentages of trace elements in lead bullets. However, he disagreed with Lundy's opinion that a finding that any two bullets were analytically indistinguishable was "consistent with" their having come from the same source, i.e., being traceable to the same "last melt." Relying on data obtained from secondary smelters, Tobin described instances where the trace elements were not homogeneous, e.g., where the percentage of antimony would be different on one side of an ingot than on the other. Tobin also described "piggybacking," i.e., filling a mold with molten lead partially from one crucible and partially from another crucible. Finally, Tobin described "repeats"—instances where manufacturers have reported identical percentages of impurities from two separate "pours." He

did not speculate on the mathematical probabilities of such an occurrence.

In overruling the motion to exclude Lundy's testimony, the trial court concentrated on the reliability of the ICP as a scientific methodology for determining the presence and amounts of trace elements in lead bullets, but did not address the validity of the opinions Lundy expressed that were based on those determinations, viz:

The evidence produced at the hearing reveals the theory and/or technique (ICP) can be and has been tested and it is undisputed it enjoys general acceptance within the relevant scientific community for determining the composition of compounds and elements within lead. Further, there was no testimony offered disputing Ms. Lundy's testimony that this technique has been subjected to peer review and publication for years. The only factor contained within DAUBERT which does not appear established by the testimony is whether there is a known or potential rate of error for the technique. There is testimony which supports the consideration of established standards controlling the technique's operation in that the FBI laboratory has developed and revised the protocol, based upon the years of utilizing the technique, which control the conduct of the procedure and analysis. Regarding the known or potential rate of error, the Court heard testimony regarding attempts and at least one study commissioned with the University of Iowa to establish such factors, but it appears no such determination was made in that regard.

Daubert, itself, supported this focus on methodology to the exclusion of the conclusions it generates. Daubert, 509 U.S. at 595, 113 S.Ct. at 2797 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that

they generate."). However, in *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the United States Supreme Court reconsidered that position.

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146, 118 S.Ct. at 519.

The trial of this case occurred in March 2002. Since then, Tobin and others have relentlessly criticized conclusions drawn from CBLA such as those rendered by Lundy in this case. William A. Tobin, *Comparative Bullet Lead Analysis: A Case Study in Flawed Forensics,* The Champion, July 2004, at 12; Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit?,* 28 Okla. City U.L.Rev. 43 (2003); William A. Tobin & Wayne Duerfeldt, *How Probative is Comparative Bullet Lead Analysis?,* 17 Crim. Just. 26 (2002); Erik Randich, et al., *A Metallurgical Review of the Interpretation of Bullet Lead Compositional Analysis,* Forensic Science International 127, 174–91 (2002). In response to these criticisms by its former chief metallurgist, the FBI in 2002 commissioned the National Research Council of the National Academies of Science (NRC) to evaluate the conclusions being drawn by its employees from CBLA test results against the reliability requirements of *Daubert* and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The FBI suspended CBLA testing while the review was pending. In February 2004, the NRC rendered a 113–page report, entitled *Forensic Analysis: Weighing Bullet Lead Evidence,* which evaluated CBLA against each *Daubert* criteria and determined that the conclusions drawn from CBLA do not meet the scientific reliability requirements established by *Daubert/Kumho.* Specifically:

> *Whether the theory can be and has been tested.* Both homogeneity and a low false positive rate are assumptions that can be and have been tested .... [T]he tests of both assumptions have weaknesses.... [T]he statistical method used by the FBI may be leading to a false positive rate much higher than that assumed by examiners. A statistical method can be chosen to minimize the false positive rate, but this is always done at the expense of a higher false negative rate. Additional testing would be needed to fully satisfy the *Daubert/Kumho* testing requirement.

> *Whether the theory has been subjected to peer review and publication.* There are very few peer-reviewed articles on homogeneity and the rate of false positive matches in bullet lead composition.... [S]ome of the published articles appeared in FBI publications. Outside reviews have only recently been published. Because this evidence is less than conclusive and the case volume that utilizes this technique is low, the subject has not received the broad review that DNA testing and some other techniques have. Again, more such work would be needed to provide a strong basis for this admissibility factor.

> *Whether the theory has a known error rate.* The false positive probability due to coincidence has been estimated by the FBI, ... but has not been published.... [T]his estimate is not based upon

an appropriately random sample of the bullet population. Laboratory error is another important factor in the false positive probability; the FBI has not estimated this factor and assumes it is essentially zero. In sum, the *Daubert/Kumho* factor requiring a theory to have a known error rate is only partially satisfied.

*The existence and maintenance of standards controlling the technique's operation* . . . . [T]he laboratory protocol needs to be revised to reflect current practice. Moreover, the FBI does not have detailed standards governing the content of laboratory reports and the testimony that may be given by examiners. As a result this *Daubert/Kumho* factor in significant part is not satisfied.

*General acceptance in the relevant scientific or technical community.* The analytic technique used [ICP] . . . has general acceptance of the scientific community for this sample type. However, to the committee's knowledge the FBI is the only laboratory performing this type of lead analysis for forensic use, so any inquiry into "general acceptance" will not provide the broad consensus that this factor assumes. The fact that courts have generally admitted this testimony is not the equivalent of scientific acceptance, owing to the paucity of published data, the lack of independent research, and the fact that defense lawyers have generally not challenged the technique.

*Id.* at 99–101.

The NRC also made findings that seriously challenge the relevancy of CBLA evidence:

*Finding:* The committee's review of literature and discussions with manufacturers indicates that the size of a CIVL [compositionally indistinguishable volume of lead] ranges from 70 lbs in a billet to 200,000 lbs in a melt. That is equivalent to 12,000 to 35 million 40-grain, .22 caliber long rifle bullets from a CIVL compared with a total of 9 billion bullets produced each year.

*Finding:* Although it has been demonstrated that there are a large number of different compositionally indistinguishable volumes of lead (CIVLs), there is evidence that bullets from different CIVLs can sometimes coincidentally be analytically indistinguishable.

*Recommendation:* The possible existence of coincidentally indistinguishable CIVLs should be acknowledged in the laboratory report and by the expert witness on direct examination.

*Finding:* Compositional analysis of bullet lead data alone does not permit any definitive statement concerning the date of bullet manufacture.

. . . .

*Finding:* The available data do not support any statement that a crime bullet came from, or is likely to have come from, a particular box of ammunition, and references to "boxes" of ammunition in any form are seriously misleading under Federal Rule of Evidence 403. Testimony that the crime bullet came from the defendant's box or from a box manufactured at the same time, is also objectionable because it may be understood as implying a substantial probability that the bullet came from the defendant's box.

*Id.* at 112–13.

Following a fourteen-month review of the findings and recommendations of the NRC, the FBI Laboratory announced on September 1, 2005, that it would no longer conduct CBLA tests. In doing so, it stated, *inter alia:*

One factor significantly influenced the Laboratory's decision to no longer con-

duct the examination of bullet lead: neither scientists nor bullet manufacturers are able to definitely attest to the significance of an association made between bullets in the course of bullet lead examination.

Press Release, U.S. Dep't of Justice, Fed. Bureau of Investigation (Sept. 1, 2005). The Kentucky State Police Crime Laboratory received official notification of the FBI's decision by a letter from the director of the FBI Laboratory dated September 1, 2005.

■ The trial court erroneously confined its *Daubert* analysis to the ICP methodology of CBLA and failed to consider the scientific reliability of the conclusions drawn by Lundy *ipse dixit* from the CBLA results. However, there is no need to remand for a new *Daubert* hearing. The scientific study commissioned by the FBI Laboratory, itself, raised questions about the reliability and relevancy of CBLA that were sufficiently serious to convince the Laboratory to discontinue forthwith CBLA testing. If the FBI Laboratory that produced the CBLA evidence now considers such evidence to be of insufficient reliability to justify continuing to produce it, a finding by the trial court that the evidence is both scientifically reliable and relevant would be clearly erroneous, *Miller v. Eldridge,* 146 S.W.3d at 917, and a finding that the evidence would be helpful to the jury would be an abuse of discretion. *Id.*

### B. False Testimony.

■ As noted, Lundy testified during cross-examination at the *Daubert* hearing that Winchester purchased its lead in block form prior to 1996, then remelted it at its manufacturing plant—a fact that would substantially reduce the number of possible bullets traceable to a particular "last melt." The crucial testimony was as follows:

Q. Now Winchester, as a manufacturer of bullets, it's my understanding, and I think I've seen maybe even where you've testified previously, that prior to 1996 they got ingots or pigs directly from the secondary supplier.

A. Yes, that's correct. *All the lead that came in was in the form of blocks that had to be remelted.*

Q. Okay, so prior to 1996 all of the lead that Winchester got from a secondary supplier had to be remelted there at their plant and then made into billets, right?

A. Yes.

(Emphasis added.) Appellant claims he did not learn that this information was untrue until Paul Szabo testified at trial that Winchester purchased blocks of lead only to manufacture shotgun shells and purchased lead billets to manufacture bullets. Thus, the only remelted lead Winchester used in the manufacture of bullets was the lead waste produced by the extrusion, chopping, and swaging processes at its plant. Otherwise, the "last melt" of its bullets occurred at the secondary smelter from which the billets were purchased.

During cross-examination at trial, Lundy admitted that her testimony at the *Daubert* hearing was false and that she knew prior to the *Daubert* hearing that Winchester purchased its bullet lead in billets in 1994. Her only explanation for her false testimony was that she had misunderstood the question. When defense counsel read the questions and answers to her from a transcript, she asserted that she could not remember if that was, in fact, her testimony.

In a post-trial in-house FBI investigation of Lundy's testimony, she submitted an affidavit explaining that she had visited

the Winchester plant in 1999 and had made a handwritten note that Winchester had switched from purchasing blocks of lead to billets in 1996—and that she had so testified during a trial in Colorado in the summer of 2001. After that testimony, Szabo informed her in a telephone conversation that took place before the *Daubert* hearing in the case *sub judice* that her handwritten note was in error and that Winchester had begun buying lead billets in 1986, not 1996. She immediately notified the prosecutor in the Colorado case of the error. With respect to her false testimony during the *Daubert* hearing in this case, the affidavit recites:

> I cannot explain why I made the original error in my testimony at the *Daubert* hearing nor why, knowing that the testimony was false, I failed to correct it at the time. I should have corrected the testimony while still on the stand in the *Daubert* hearing, but I made a stupid decision not to and then did not know what to do.
>
> . . . .
>
> . . . It was only after the cross-examination at trial that I knew I had to address the consequences of my actions.

Lundy was subsequently indicted by a Fayette County grand jury for false swearing, KRS 523.040 ("mak[ing] a false statement which he does not believe under oath"), a Class B misdemeanor. Lundy entered a plea of guilty to that offense in the Fayette District Court.

Upon learning of these events, Appellant moved for a new trial on grounds that the *Daubert* ruling had been procured by perjured testimony. The trial judge overruled the motion, explaining that his ruling on the admissibility of the CBLA evidence would have been the same even if he had known that the analytically indistinguishable bullets had likely been last melted at a secondary smelter rather than at the Winchester plant. Further, Appellant was aware of Lundy's error at the time she testified at trial and employed it in an attempt to impeach her credibility at trial. However, Lundy's explanations at trial that she had misunderstood the question and could not remember her prior testimony left the impression that her prior testimony was merely a mistake caused by a misleading question as opposed to known false testimony. Nevertheless, we would not reverse this case solely on the basis of this newly discovered evidence.

Whether to grant a new trial on the basis of newly discovered evidence is largely within the discretion of the trial court, and the standard of review is whether there has been an abuse of that discretion. It was formerly held that newly discovered evidence which merely impeaches or is collateral is insufficient unless it impeaches the only material witness in the case. . . . More recently, we have held that newly discovered evidence that merely impeaches the credibility of a witness or is cumulative is generally disfavored as grounds for granting a new trial. The evidence must be of such decisive value or force that it would, with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.

*Foley v. Commonwealth,* 55 S.W.3d 809, 814 (Ky.2000) (citations and quotations omitted). There is no allegation that Appellant's conviction was obtained by perjured evidence. *Compare McGregor v. Commonwealth,* 253 S.W.2d 624, 625 (Ky. 1952) ("[W]hen the discovered evidence is of such compelling weight that it probably would have induced the jury to reach a different verdict, a new trial will be granted."). Nor does this evidence prove a motive for Lundy to fabricate the substantive evidence she presented at trial. *Com-*

pare *Williams v. Commonwealth,* 569 S.W.2d 139, 144–45 (Ky.1978) (granting new trial where evidence of separate plea deal with sole eyewitness was discovered after conviction). Moreover, Appellant was able to impeach Lundy's credibility by showing that she had made a prior inconsistent statement, albeit the impeachment would have been more effective if the jury had known that her *Daubert* hearing testimony had been knowingly false. However, the fact that Lundy felt compelled to knowingly give false testimony about a fact of significance during the *Daubert* hearing reinforces the NRC's conclusions that Lundy's opinions based on CBLA evidence do not satisfy the reliability requirements of *Daubert/Kumho.*

The Commonwealth conceded the obvious at oral argument—that this case was based on circumstantial evidence. Except for the facts that (1) her written report was not introduced at trial and (2) she changed her testimony with respect to whether Winchester remelted the lead it used to manufacture bullets in 1994, Lundy's testimony at trial largely mirrored that which she gave at the *Daubert* hearing. The clear implication of her testimony was that the murder bullet and nine of the bullets found at the Ragland residences all came from the same batch of molten lead and were all packaged at approximately the same time. Other than the inconclusive testimony of the firearms examiner, this was the only evidence linking Appellant to the murder bullet. Thus, we are unable to conclude that there is no substantial possibility that the result would have been different but for the admission of the CBLA evidence. *Compare Abernathy v. Commonwealth,* 439 S.W.2d 949, 952 (Ky.1969), *overruled on other grounds by Blake v. Commonwealth,* 646 S.W.2d 718, 719 (Ky.1983). Thus, the erroneous admission of this evidence was not harmless error. RCr 9.24.

## II. SEARCH WARRANTS.

■ Appellant asserts that the evidence recovered during the execution of the federal search warrants should have been suppressed on grounds that (1) the affidavit supporting the warrants was insufficient to establish probable cause, and (2) the warrants were procured by deliberate falsehood or a reckless disregard for the truth.

The affidavit executed by Special Agent Miller alleged that Miller was investigating federal charges of drug trafficking in violation of 21 U.S.C. § 846 and possession of a firearm by an unlawful user or addicted person in violation of 18 U.S.C. § 922(g)(3). In addition to the information obtained from Aimee Lloyd about her knowledge of the location of the rifle and the marijuana-growing operations, the affidavit recited a December 1997 arrest of Appellant for DUI (operating a motor vehicle while under the influence of alcohol), at which time he was in possession of marijuana and a pistol and stated that his address was 501 Capital Avenue, Frankfort; another arrest of Appellant for DUI in November 1999, at which time he was in possession of marijuana and drug paraphernalia and also stated that his address was 501 Capital Avenue; and a third arrest of Appellant for DUI in March 2000, at which time he was in possession of marijuana and drug paraphernalia and stated that his address was 1469 Old Lawrenceburg Road, Frankfort. The affidavit also described the following "trash pulls":

March 3, 2000, at 501 Capital Avenue, finding plastic bags with marijuana residue and pieces of paper with notations of weights, construed to be drug records;

April 7, 2000, at 501 Capital Avenue, finding a marijuana cigarette;

April 14, 2000, at 501 Capital Avenue, finding a plastic bag with marijuana seeds and stems;

April 19, 2000, at 1469 Old Lawrenceburg Road, finding a scrap of paper with a notation from "JR" [Appellant's father] to "Amy" [father's secretary] stating that he would be in court today with Shane [Appellant];

April 21, 2000, at 501 Capital Avenue, finding a plastic bag with marijuana residue;

April 28, 2000, at 501 Capital Avenue, finding marijuana residue;

May 3, 2000, at 1469 Old Lawrenceburg Road, finding a list of names and telephone/pager numbers, at least four of the names and numbers being those of known or suspected drug dealers. The list also contained two entries for "Dad" indicating the list was prepared by Appellant, not his father;

May 5, 2000, at 501 Capital Avenue, finding a marijuana plant [the plant was later determined not to be marijuana, but that information was not obtained until after the warrant was executed];

May 10, 2000, at 1469 Old Lawrenceburg Road, finding an envelope postmarked May 2, 2000, addressed to "Shane Ragland, 1469 Old Lawrenceburg Road, Frankfort, Kentucky," [indicating that to be Appellant's residence].

Finally, the affidavit recited that on June 28, 2000, Aimee Lloyd received an e-mail message from Appellant advising her that he could be reached at either the telephone number for the 1469 Old Lawrenceburg Road residence or the telephone number for the 501 Capital Avenue residence.

### A. Probable Cause.

▆▆▆ A magistrate's determination of probable cause is entitled to "great deference" and should be upheld so long as the magistrate had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (internal quotation omitted); *Beemer v. Commonwealth,* 665 S.W.2d 912, 914 (Ky.1984); *see also Massachusetts v. Upton,* 466 U.S. 727, 732–33, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984) (reemphasizing *Gates* ). *Gates* established a "totality of the circumstances" approach to probable cause. 462 U.S. at 230–31, 103 S.Ct. at 2328. Under this test, the issuing magistrate need only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. at 2332. The trial court concluded that the evidence outlined in the affidavit was sufficient to establish probable cause that there was a fair probability that evidence of a crime would be found at either or both of the properties at 501 Capital Avenue and 1469 Old Lawrenceburg Road.

▆▆▆ Appellant argues, however, that probable cause cannot be premised upon "stale" information, relying primarily on *United States v. Grant,* 108 F.Supp.2d 1172 (D.Kan.2000). Indeed, the federal district judge in *Grant* found that evidence of one sale of cocaine at a particular location six months prior to the issuance of the warrant, coupled with the defendant's past record of drug activity, was insufficient to establish probable cause. *Id.* at 1175–76. However, the court also noted:

In reviewing the issue of staleness, it is important to look at the nature of the offense and the length of criminal activity, not simply the number of days that have elapsed. Where the offense in question is ongoing and continuing, the passage of time is not of *critical impor-*

tance. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

*Id.* at 1175 (quotations and citations omitted). *See also United States v. Spikes,* 158 F.3d 913 (6th Cir.1998):

[W]hether information contained in an affidavit is stale "must be determined by the circumstances of each case." *Sgro* [*v. United States* ], 287 U.S. at 210–211, 53 S.Ct. 138, 77 L.Ed. 260. In judging the "circumstances of each case," the length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling.

As this court recognized in *United States v. Henson,* "[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." 848 F.2d 1374, 1382 (6th Cir.1988). Rather, the question of staleness depends on the "inherent nature of the crime." *Id.* Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc." *Andresen v. State,* 24 Md. App. 128, 331 A.2d 78, 106 (1975). As these variables demonstrate, even if a

significant period has elapsed since a defendant's last reported criminal activity, it is still possible that, depending upon the nature of the crime, a magistrate may properly infer that evidence of wrongdoing is still to be found on the premises. *See United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (holding information not stale even though an informant said that two years ago he had remodeled defendant's premises to allow him to grow marijuana on second floor, with the court emphasizing that the information showed "an ongoing criminal business of a necessarily long-term nature"); *see also United States v. Johnson,* 461 F.2d 285, 287 (10th Cir. 1972) (stating the general principle that when "the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant").

*Id.* at 923–24. Furthermore, "[w]here recent information corroborates otherwise stale information, probable cause may be found." *Id.* at 924 (quotation omitted).

While Lloyd's information about the marijuana-growing operation, standing alone, was arguably "stale," it was corroborated by Appellant's possession of marijuana at the time of his recent arrests and the marijuana and drug-related evidence found during the "trash pulls" at his parents' respective residences. Further, we do not believe the "staleness" test applies to Appellant's continued possession of the .243 caliber rifle at his mother's residence, which could be more accurately categorized as a "secure operational base" than a "mere criminal forum of convenience." One could surmise that if the rifle was the murder weapon and Appellant intended to dispose of it, he would have done so shortly after the offense was committed, and it was, therefore, "of enduring utility to its holder." *Id.* at 924.

## B. Alleged False and Misleading Information.

Appellant requested and received a so-called *Franks* hearing on the issue of whether the affidavit contained false and misleading information. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This issue also pertains to whether the persons executing the warrant, who included the affiant, were entitled to a "good faith" reliance on the warrant, if invalid. *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984); *Crayton v. Commonwealth*, 846 S.W.2d 684, 688 (Ky.1992). At the conclusion of the *Franks* hearing, the trial court entered a written order finding that the affidavit in support of the search warrant contained no statements that were false or made in reckless disregard of the truth. Without detailing each allegation and the evidence refuting it, suffice it to say that the trial court's finding in that respect was supported by substantial evidence. RCr 9.78.

## III. CUSTODIAL INTERROGATION.

Appellant asserts that the statements he made during the July 14, 2000, interrogation should have been suppressed because (1) he received inadequate *Miranda* warnings, (2) he never waived any of his *Miranda* rights, and (3) he asserted his right to counsel.

### A. Adequacy of Warnings.

After obtaining preliminary identification information, i.e., name, address, date of birth, etc., Sergeant Barnard of the Lexington police, the lead interrogator, advised Appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The transcript of the videotaped interrogation seems to support Appellant's claim that the warning was inadequate. The transcript reads:

> Barnard: You got the right to remain silent. Anything you say can—do you understand your rights? You have the right to an attorney. If you can't afford one will be appointed to you. Anytime during questioning you want one (unintelligible) just ask me and you can have one. You understand those?
>
> Ragland: (unintelligible).

At the suppression hearing, Barnard explained that he actually said: "Anything you say can be used against you in court," but the videotape operator had inadvertently turned off the volume switch, causing the missing words to be unrecorded. A review of the videotape reveals that Barnard did continue speaking and gesturing after he is heard to say "Anything you say" and before he is heard to say "do you understand your rights?" The trial court accepted Barnard's explanation and found that Appellant had been adequately warned. *Miranda* does not require a "talismanic incantation" as long as the warnings adequately advise the suspect of his *Miranda* rights. *California v. Prysock*, 453 U.S. 355, 359–60, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981); *Miranda*, 384 U.S. at 476, 86 S.Ct. at 1629 ("The warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." (Emphasis added.)). Nor do the warnings have to be in writing, *United States v. Stuckey*, 441 F.2d 1104, 1105 (3d Cir.1971), much less audiotaped or videotaped. *Cf. Brashars v. Commonwealth*, 25 S.W.3d 58, 60–62 (Ky. 2000) (no constitutional requirement that confession be recorded). The trial court's finding that parts of Barnard's warnings to Appellant were inadvertently deleted from

the audio portion of the videotape was supported by substantial evidence, thus is conclusive. RCr 9.78.

### B. Waiver.

 Appellant asserts that he neither acknowledged that he understood his *Miranda* rights nor specifically waived them. However, while the transcript reflects that his response to the inquiry as to whether he understood his rights was unintelligible, the videotape clearly shows him nodding his head in the affirmative. *See State v. Flores,* 9 Ariz.App. 502, 454 P.2d 172, 177 (1969) (suspect shook head "yes"); *People v. Crane,* 145 Ill.2d 520, 165 Ill.Dec. 703, 585 N.E.2d 99, 103–04 (1991) (affirmative nod). Shortly thereafter, he made statements indicating that he knew he had the right to counsel. He then voluntarily answered the questions asked by his interrogators. A suspect may waive his *Miranda* rights either expressly or implicitly. *North Carolina v. Butler,* 441 U.S. 369, 375–76, 99 S.Ct. 1755, 1758–59, 60 L.Ed.2d 286 (1979). When a suspect has been advised of his rights, acknowledges an understanding of those rights, and voluntarily responds to police questioning, he may be deemed to have waived those rights. *Gorham v. Franzen,* 760 F.2d 786, 795 (7th Cir.1985) ("His failure to invoke clearly those rights, which he knew and understood, amounted to a waiver of his right to remain silent under the fifth amendment."); *United States v. Ogden,* 572 F.2d 501, 502–03 (5th Cir.1978) ("After he was given the Miranda warnings, defendant indicated that he understood them, but nevertheless he chose to inculpate himself. There was no evidence that defendant's decision to speak was anything but voluntary."); *see also United States v. Ferrer–Cruz,* 899 F.2d 135, 141 (1st Cir.1990) ("The basic governing legal rule is that a court, in considering whether a defendant has voluntarily relinquished

his Fifth Amendment rights, must examine the 'totality of circumstances surrounding the interrogation.' "). The trial court's finding that Appellant voluntarily waived his *Miranda* rights was supported by substantial evidence. RCr 9.78.

### C. Invocation of Right to Counsel.

[18] Shortly after Appellant acknowledged that he understood his *Miranda* rights, the following colloquy occurred:

Ragland: Do I need to get an attorney for this because I'm really concerned?

Barnard: Okay. Well, that, that's your choice.

Ragland: I don't think I need one but you know . . . .

Barnard: Okay, that's, that's your choice. Okay, all I can tell you, I read your rights.

 If at any time during a police interrogation the suspect has "clearly asserted" his right to counsel, the interrogation must cease until an attorney is present. *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *see also Miranda,* 384 U.S. at 474, 86 S.Ct. at 1627. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). In *Davis,* the statement, "Maybe I should talk to a lawyer," *id.* at 455, 114 S.Ct. at 2353, was held not to have been a clearly asserted request for counsel. *See also Moran v. Burbine,* 475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 1147 n. 4, 89 L.Ed.2d 410 (1986) ("[T]he interrogation must cease until an attorney is present *only* if the individual states that he

wants an attorney." (Citations and quotations omitted.)). In *Dean v. Commonwealth*, 844 S.W.2d 417 (Ky.1992), we held that the request for counsel must be "unambiguous and unequivocal" in order to have been "clearly asserted" as required by *Edwards. Id.* at 420. We agree with the trial court that Appellant's quoted statements did not amount to an "unambiguous and unequivocal" request for counsel such as to require cessation of further interrogation. Later in the interrogation, Appellant did request an attorney, and the trial court properly suppressed any statements he made after that request.

## IV. HEARSAY.

■ In the fall of 1991, Appellant, DiGiuro, and Matt Blandford were all college freshmen at the University of Kentucky. Blandford and Appellant had pledged the same social fraternity. Blandford and DiGiuro shared the same dormitory room, and they had hung a wall calendar containing photographs of female students. One afternoon, while in the dormitory room with Blandford and DiGiuro, Appellant boasted that he had "slept with" one of the female students pictured on the calendar. The student in question happened to be the girlfriend of a senior member of the fraternity Appellant had pledged. Shortly thereafter, the senior fraternity member confronted Appellant about the boast and Appellant was subsequently "blackballed" from the fraternity. Blandford testified that he and DiGiuro later encountered Appellant while walking across campus and that Appellant accused him (Blandford) of having told the senior fraternity member about his boast. According to Blandford, DiGiuro intervened and said that he was the one who had reported the boast to the senior fraternity member. This repetition of DiGiuro's statement was not hearsay because it was not offered to prove the truth of DiGiuro's statement, *i.e.*, that he was the person who reported Appellant's boast to the senior fraternity member. KRE 801(c) (hearsay defined as an out-of-court statement offered to prove the truth of the matter asserted). Rather, it was offered only to prove DiGiuro made the statement that provided the motive for Appellant to kill him in revenge. *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir.1993) (victims' statements, even if false, provided motive for murder); *People v. Moss*, 205 Ill.2d 139, 275 Ill.Dec. 444, 792 N.E.2d 1217, 1229 (2001) (same); *State v. Cox*, 344 N.C. 184, 472 S.E.2d 760, 763 (1996) (same).

■ Sometime later, Blandford and Appellant engaged in a fight at a local bar. Blandford testified that he told DiGiuro about the fight and that DiGiuro told him that he was going to call Appellant. Although this statement was hearsay, it was admissible under the state-of-mind exception to the hearsay rule, KRE 803(3), because it was a statement of future intent. *Crowe v. Commonwealth*, 38 S.W.3d 379, 383 (Ky.2001).

## V. BALLISTICS TESTING.

■ The ballistics expert who test-fired bullets from the .243 Wetherby Vanguard rifle found at 501 Capital Avenue testified that the markings found on the test bullets were similar to those found on the bullet fragment removed from DiGiuro's body. However, because of the degree of fragmentation of the murder bullet, the witness could not state conclusively that the Ragland rifle fired the murder bullet. There was evidence that 1,418.243 caliber Wetherby Vanguard rifles were manufactured between 1986 and 2000. The police were able to locate three more of those rifles. Ballistics testing of those three rifles revealed that none could have fired the bullet that killed DiGiuro.

Appellant asserts this evidence was irrelevant and highly prejudicial. KRE 403. We disagree. The evidence was relevant to dispel a possible claim that any .243 caliber Wetherby Vanguard rifle would have left the same markings on the murder bullet. Evidence demonstrating that other rifles of the same caliber manufactured by the same manufacturer caused different markings on test-fired bullets enhanced the relevancy of the evidence that markings on bullets test-fired from the Ragland rifle were similar to the markings found on the murder bullet. In other words, it provided additional circumstantial evidence that the Ragland rifle fired the fatal shot.

## VI. COMMENT ON SILENCE.

### OPINION OF THE COURT

 The Commonwealth played for the jury during its case-in-chief most of Appellant's July 14, 2000, videotaped interrogation by Lexington police officers. Appellant exercised his Fifth Amendment right not to testify in his own defense. During the guilt-phase closing argument, defense counsel made the following argument:

> They don't know the location of the shot.... They don't know where the shot was fired from. They picked out five locations that they thought might be best, but they're just speculating. They don't know where this shot was fired from.

During his closing argument, the prosecutor responded:

> We're not saying that the shot was fired from underneath that bush. You've never heard us say the shot was fired from underneath that bush. ... That is a place the shot could have been fired from. It's a place that has a line of sight to the porch. It happens to be a place that lines up very well with the

idea that Trent is sitting in this chair kind of angled to the center or maybe looking over at his friends and gets shot straight across. So it matches that very well. And it's a place where it has those two marks in the ground. But we're not saying that's where it's fired from. We don't know where that shot was fired from. The only person who knows where that shot was fired from exactly is the person sitting in that chair over there [indicating Appellant] and he hasn't seen fit to tell us.

Defense counsel objected, moved for a mistrial, and requested, alternatively, that the jury be admonished to disregard the comment. The objection was overruled, the motion for a mistrial was denied, and the requested admonition was not given.

Defense: I want to object, Your Honor. Could I come forward a moment?

[At the bench.]

Defense: He's just commented on the defendant not taking the witness stand.

Pros.: I did not.

Defense: And we, we would accordingly move for a mistrial. Yes, he said, "He didn't tell us." And I'm sure that's what I heard him say.

Pros.: I didn't say anything about testifying. I said he didn't tell. He was interviewed and he gave a statement. And they got up here and relied on his statement today as evidence in this case. And that's what I'm talking about. I'm talking about his statement to the police. Now, I'll clear it up and say about the police if you want.

Judge: Well, I'll overrule the objection.

Defense: We'd ask you to admonish the jury.

. . . .

Pros.: Whatever you think is appropriate to do Judge. I mean if you want to say that. I'll, I'm going to go back and clarify I'm talking about when he talked to the police about what happened he didn't tell them.

Judge: That will be sufficient.

Pros.: [continuing closing argument]: What I'm talking about ladies and gentlemen, is that the defendant talked to the police about this case and they asked him about it and ʼhe didn't say, "You know, I shot it from over here." That's what I'm talking about. He didn't say anything about that.

■ Although the prosecutor's statement might be viewed as "teeter[ing] on the fine line between impermissible comment on the [defendant's] failure to testify and a permissible comment on the lack of evidence," *United States v. Rahseparian,* 231 F.3d 1267, 1274 (10th Cir.2000), the majority of this Court believes that the remark was not a comment on Appellant's failure to testify. "Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify," *Ex parte Loggins,* 771 So.2d 1093, 1101 (Ala.2000), and not every comment upon silence is reversible error. *See United States v. Robinson,* 485 U.S. 25, 33–34, 108 S.Ct. 864, 869–70, 99 L.Ed.2d 23 (1988) ("The broad dicta in *Griffin [v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ] to the effect that the Fifth Amendment 'forbids ... comment by the prosecution on the accused's silence,' must be taken in the light of the facts of that case. It is one thing to hold, as we did in *Griffin,* that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would pro-

hibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence." (Citation omitted.)); *Dillard v. Commonwealth,* 995 S.W.2d 366, 374 (Ky.1999) ("But not every reference to a defendant's failure to testify constitutes reversible error."); *Childers v. Commonwealth,* 246 Ky. 751, 56 S.W.2d 352, 354 (1933) ("[N]ot every case will be reversed where the commonwealth's attorney in his argument comments on the defendant's failure to testify ....").

■ Historically, courts drew distinctions between "direct" comments upon a defendant's failure to testify, which were usually held to be improper and prejudicial, and "indirect" comments, which were usually found not to warrant reversal. *See Moore v. State,* 669 N.E.2d 733, 740 (Ind. 1996); *State v. Neff,* 978 S.W.2d 341, 344 (Mo.1998) ("A direct reference to an accused's failure to testify is made when the prosecutor uses words such as 'defendant,' 'accused' and 'testify' or their equivalent. An indirect reference is one reasonably apt to direct the jury's attention to the defendant's failure to testify." (Citations omitted.)). Now, however, "a less formalistic rule," *Moore,* 669 N.E.2d at 737, governs such inquiries, and it is generally accepted that a comment violates a defendant's constitutional privilege against compulsory self-incrimination only when it was manifestly intended to be, or was of such character that the jury would necessarily take it to be, a comment upon the defendant's failure to testify, *Butler v. Rose,* 686 F.2d 1163, 1170 (6th Cir.1982); *Knowles v. United States,* 224 F.2d 168, 170 (10th Cir.1955); *Byrd v. Commonwealth,* 825 S.W.2d 272, 275 (Ky.1992) ("A prosecutor's comment on the failure of a defendant to testify must be manifestly intended to reflect on the accused's silence or of such a character that the jury would naturally and necessarily take it as such to consti-

tute prejudice." (citing *Bagby v. Sowders*, 894 F.2d 792 (6th Cir.1990)), *overruled on other grounds by Shadowen v. Commonwealth*, 82 S.W.3d 896, 897–98 (Ky.2002)), or invited the jury to draw an adverse inference of guilt from that failure. *Robinson*, 485 U.S. at 33–34, 108 S.Ct. at 869–70; *Moore*, 669 N.E.2d at 739.

The majority of this Court further believes that the prosecutor said nothing that could be construed as a request that the jury should infer guilt from the fact that Appellant failed to take the witness stand and assert his innocence, and that it is only in the most remote sense that the statement could be characterized as a comment upon Appellant's failure to testify at trial. Instead, the majority of this Court believes that when considered in context, the statement at issue constituted a concession about and an explanation for uncertainty as to one aspect of the Commonwealth's theory of the case and that it was made in response to defense counsel's closing argument. *See Robinson*, 485 U.S. at 33–34, 108 S.Ct. at 869–70; *Montgomery v. Commonwealth*, 346 S.W.2d 479, 482 (Ky.1961) ("It seems to us apparent that when the questionable statements of the prosecuting attorney, with their attendant circumstances, are considered, they were provoked by and made in response to previous statements of the defendant's attorney before the jury."); *Brooks v. Commonwealth*, 281 Ky. 415, 136 S.W.2d 552, 553 (1940) ("[H]e had a right to answer any argument made by defendant's attorney."); *Rogers v. Commonwealth*, 161 Ky. 754, 171 S.W. 464, 467 (1914); *cf. Thompson v. Commonwealth*, 477 S.W.2d 802, 804 (Ky.1972) (comment on right to testify in response to defendant's outbursts during examination of other witnesses).

▮ "[P]rosecutorial comment must be examined in context," *Robinson*, 485 U.S. at 33, 108 S.Ct. at 869; *see also Williams v. Commonwealth*, 464 S.W.2d 244, 249 (Ky.1971), *vacated in part on other grounds Williams v. Kentucky*, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972); *Neff*, 978 S.W.2d at 345, and, if there is another, equally plausible explanation for a statement, malice will not be presumed and the statement will not be construed as comment on the defendant's failure to testify. *State v. Ball*, 675 N.W.2d 192, 200 (S.D.2004) ("A prosecutor's intent is not 'manifest' if there is an equally plausible explanation for the prosecutor's remarks." (citing *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir.1992))); *Ranger v. State*, 249 Ga. 315, 290 S.E.2d 63, 67–68 (1982). The majority of this Court concludes that the context of the statement at issue here—and specifically, the fact that it was in response to defense argument—is critical to its interpretation, and that "[i]n context, the prosecutor's comments were but a small part of a summary of the evidence best understood as conceding the ambiguities therein and were unlikely to be interpreted as comments on [Appellant's] failure to testify." *Wellons v. State*, 266 Ga. 77, 463 S.E.2d 868, 879 (1995) (finding no prosecutorial misconduct in the prosecutor's guilt-phase closing argument statements that "only two people know what went on in that apartment" and "there's only two people who can tell us how long that horror lasted"); *see also Bowling v. Commonwealth*, 873 S.W.2d 175, 178 (Ky.1993) ("We can't tell you what [the motive] is because only the man who pulled the trigger knows.").

Appellant argues that the prosecutor's use of the first-person plural indicated that his statement referred to Appellant's failure to speak to an "us" that included the jury, *i.e.*, a direct comment on Appellant's failure to testify. However, a majority of this Court believes that this reference alluded to a remark made approximately ten

minutes earlier in his closing argument to "us" as being the parties involved in the prosecution: "It's taken us—and by 'us' I mean the police and I mean the Commonwealth of Kentucky—almost eight years now to bring this case to this point."

In conclusion, the majority of this Court believes that, at worst, the prosecutor's brief and isolated comment could be construed as an indirect comment upon Appellant's failure to take the stand, but in context, and in light of the prosecutor's immediate clarification, the statement carried no such implication and certainly did not suggest that the jury should draw an inference of guilt from Appellant's failure to testify.

█ The majority of the Court is also of the opinion that any possible error was cured by the fact that the trial court gave a "no adverse inference" instruction to the jury, *see* RCr 9.54(2), *i.e.*, "the fact that the Defendant did not testify in this case cannot be used as an inference of guilt and should not prejudice him in any way," and the fact that the prosecutor gave the jury a plausible explanation for his remark.

Accordingly, Appellant's conviction and the sentence imposed therefor are reversed and this case is remanded to the Fayette Circuit Court for a new trial.

SCOTT, J., concurs.

COOPER, J., concurs as to Parts I–V and dissents as to Part VI, by separate opinion in which LAMBERT, C.J., and JOHNSTONE, J., join.

ROACH, J., concurs as to Parts II–V, concurs in result only as to Part I, and neither concurs nor dissents as to Part VI, by separate opinion.

WINTERSHEIMER, J., dissents by separate opinion in which GRAVES, J., joins.

COOPER, Justice, Concurring in Part and Dissenting in Part.

I concur in Parts I through V of the majority opinion. However, I dissent from Part VI because I believe the prosecutor's comment during closing argument was a direct comment on Appellant's failure to testify and, thus, violated his constitutional right not to be compelled to be a witness against himself.

*The only person who knows where that shot was fired from exactly is the person sitting in that chair over there [indicating Appellant] and he hasn't seen fit to tell us.*

(Emphasis added.)

The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964), forbids comment by the prosecution on the accused's silence at trial. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *Lent v. Wells,* 861 F.2d 972, 974–77 (6th Cir.1988) (finding reversible error where prosecutor stated in closing argument: "[The defense attorney] is going to get up here and say, well, this could've been, and that could've been. Well, could've been didn't take the stand."). In fact, such has been the statutory law of Kentucky since 1893, long before *Griffin* was decided:

In any criminal or penal prosecution the defendant, on his own request, shall be allowed to testify in his own behalf, *but his failure to do so shall not be commented upon* or create any presumption against him.

KRS 421.225 (originally enacted as KS 1645, 1893 Ky. Acts, ch. 227, § 22, at 1163) (emphasis added).

The prosecutor's comment in this case was almost identical to the comment that

required reversal for a new trial in *Bradley v. Commonwealth*, 261 S.W.2d 642 (Ky. 1953), *viz:*

> There was one person in my opinion who could have told you, but if anybody told you I didn't hear it.

*Id.* at 643. It was also similar to the comment condemned in *Griffin:*

> These things he has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know.

*Griffin*, 380 U.S. at 611, 85 S.Ct. at 1231.

In *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir.1979), the United States Court of Appeals for the Sixth Circuit granted a writ of habeas corpus and ordered a new trial in a Kentucky case because the prosecutor gestured toward the defendant during closing argument while remarking: "What other witnesses could the defendant's case have put forward who were totally available to you? What other witnesses? Ask yourself that question. Who else could have testified in this case?" *Id.* at 278–80. A new trial was ordered despite the fact that the trial court had sustained the defendant's objection to the remarks, but had failed to grant a mistrial or to admonish the jury to disregard the remarks. *Id.* The Court also rejected our conclusion that the error was harmless under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), noting that "[i]t only takes a single comment, however, to remind a jury that the defendant has not testified and to fix in the jurors' minds the impermissible inference that the defendant is guilty merely because of his exercise of that right." *Eberhardt*, 605 F.2d at 279.

In *Rachel v. Bordenkircher*, 590 F.2d 200 (6th Cir.1978), the Sixth Circuit granted a writ of habeas corpus and ordered a new trial in yet another Kentucky case, characterizing the following remarks by the prosecutor in closing argument as a "flagrant violation of *Griffin*":

> We don't know when he was made a captive for example. We don't know how or whether or when he was beaten. We don't know what happened to him in the hour or two hours before he was taken up there and choked to death and dumped over the mountainside. We will never know, these men won't tell us.

*Id.* at 202, 204. Of course, these remarks condemned by the Sixth Circuit in *Rachel* were almost identical to the prosecutor's remarks in the case *sub judice.*

Even so, the majority of this Court construes the prosecutor's comment as something other than a comment on Appellant's failure to testify. First, the prosecutor explained to the Court during the bench conference on defense counsel's objection:

> I didn't say anything about testifying. I said he didn't tell. He was interviewed and he gave a statement. And they got up here and relied on his statement today as evidence in this case. And that's what I'm talking about. I'm talking about his statement to the police. Now, I'll clear it up and say about the police if you want.

The prosecutor then told the jury:

> What I'm talking about ladies and gentlemen, is that the defendant talked to the police about this case *and they asked him about it and he didn't say, "You know, I shot it from over here."* That's what I'm talking about. He didn't say anything about that.

(Emphasis added.)

The problem with the prosecutor's explanation is that the videotape of the July 14, 2000, interrogation reflects that the police *never asked* Appellant about the location from where the shot was fired—in fact, they never asked him if he fired the shot or even whether he killed DiGiuro.

Instead, the interrogation focused largely on whether Appellant had told Aimee Lloyd that he killed DiGiuro. Thus, there was no basis for the prosecutor's claim that the police "asked" Appellant during his interrogation about the location from where the shot was fired and that he had not "seen fit to tell us." Since the prosecutor's comment could not have referred to Appellant's silence during the police interrogation, it could have referred only to Appellant's failure to testify at trial.[1]

Like the prosecutor's faulty attempt at an explanation, the case law cited in the majority opinion does not support the conclusion that it has reached in this case.

In three of the cases relied upon by the majority opinion, the trial court cured the error by sustaining the objection and admonishing the jury to disregard the prosecutor's comment. *Childers v. Commonwealth*, 246 Ky. 751, 56 S.W.2d 352, 353 (1933) (trial court admonished jury to disregard comment); *Moore v. State*, 669 N.E.2d 733, 741 (Ind.1996) (trial court admonished jury to disregard comment and polled the jury to ensure that each juror could follow that admonition); *State v. Neff*, 978 S.W.2d 341, 344 (Mo.1998) (trial court admonished jury to disregard remark which prosecutor claimed was inadvertent). Here, the trial court overruled the objection and denied Appellant's request to admonish the jury to disregard the prosecutor's comment. The prosecutor made no claim that the remark was inadvertent. Further, in *Moore*, the Indiana Supreme Court, while noting that the trial court's actions cured any error, specifically noted:

> The Fifth Amendment privilege against compulsory self-incrimination is violated

when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from a defendant's silence.

*Moore*, 669 N.E.2d at 739, 741.

In four of the cases cited by the majority opinion, there was no direct reference to the defendant's silence but only a general reference to the weakness of the defendant's case. *Williams v. Commonwealth*, 464 S.W.2d 244, 249 (Ky.1971) ("No defense in God's world to this brutal murder has been presented to you.... [E]verything that has been presented to this jury ... stands undenied, by any witness from that witness stand."), *vacated in part by Williams v. Kentucky*, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972); *Butler v. Rose,* 686 F.2d 1163, 1166–67 (6th Cir. 1982) ("He cannot do this and just get back and have an attorney say, 'ah, she [victim] is just not telling the truth.' Without putting one witness to show why she might be telling otherwise or how she might be telling otherwise."); *Knowles v. U.S.*, 224 F.2d 168, 170 (10th Cir.1955) ("not the slightest bit of explanation given to the Internal Revenue Department about it, or given to you"); *Ranger v. State*, 249 Ga. 315, 290 S.E.2d 63, 68 (1982) ("I'm sure [defense counsel] is going to argue a whole lot of facts up here before you, but the defense has put forward no explanation of any accident."). Here, the prosecutor did not make a general comment on the weakness of Appellant's case; he made a direct comment on Appellant's failure to testify.

Similarly, in neither *Bowling v. Commonwealth*, 873 S.W.2d 175, 178 (Ky.1993), nor *Wellons v. State*, 266 Ga. 77, 463 S.E.2d 868, 879 (1995), was there a direct

---

1. As for the suggestion that defense counsel "opened the door" by relying on the police interrogation during his own closing argument, the only reference made to the interro-gation by defense counsel was to Appellant's statement, when informed by the police that his room was being searched as they spoke, that "I have nothing to hide."

reference to the defendant's failure to testify. In *Bowling*, the comment was: "We can't tell you what it [the motive] is because only the man who pulled the trigger knows." 873 S.W.2d at 178. The prosecutor did not add, as did Appellant's prosecutor, that "the only person who knows [the motive] is [the defendant] and he has not seen fit to tell us." On habeas review, the Sixth Circuit held that the statement in *Bowling* only indicated that the prosecution had done everything it could to prove a motive. *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir.2003), *cert. denied sub nom.*, *Bowling v. Haeberlin*, 543 U.S. 842, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004). In *Wellons*, the statement was that "only two people know what went on in that apartment," and "there's only two people who can tell us how long that horror lasted." 463 S.E.2d at 879. The prosecutor did not add, as did Appellant's prosecutor, that "[one of them] is sitting in that chair over there and he hasn't seen fit to tell us."

In three cases cited by the majority opinion, the prosecutor's comment was in response to statements made during the defendant's closing argument. In *Montgomery v. Commonwealth*, 346 S.W.2d 479, 480 (Ky.1961), the defendant admitted to a police officer that he was guilty but did not testify at trial. Defense counsel stated in closing argument that "it is unusual for a person to come in and admit before a jury that he is guilty of an offense," and the prosecutor corrected him by noting that the defendant had not testified. *Id.* at 481. Later, defense counsel explained that a police officer had already "testified the same thing as what this defendant could have told you." *Id.* The prosecutor stated that "not one witness was called to that witness chair except by the Commonwealth." *Id.* at 482. This was held a proper response to defense counsel's closing argument. *Id.* at 481–82. In *Brooks v. Commonwealth*, 281 Ky. 415, 136 S.W.2d

552, 553–54 (1940), the prosecutor mentioned the fact that the defendant had not testified only after defense counsel tried to explain to the jury why his client had not testified. Here, defense counsel made no reference in closing argument to the fact that Appellant had not testified. The fact that he pointed out a weakness in the Commonwealth's case did not "open the door" for the prosecutor to comment on Appellant's failure to strengthen the Commonwealth's case by supplying the missing information. Finally, in *United States v. Robinson*, 485 U.S. 25, 26, 108 S.Ct. 864, 866, 99 L.Ed.2d 23 (1988), defense counsel stated in his closing argument that the government had not allowed the defendant to explain his side of the story. The prosecutor responded that the defendant "could have taken the stand and explained it to you." *Id.* Finding that defense counsel had opened the door to the prosecutor's remark, the Court, however, also reaffirmed that "[w]here the prosecutor *on his own initiative* asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated." *Id.* at 32, 108 S.Ct. at 869 .(emphasis added). That is exactly what occurred in the case *sub judice*.

The opinions in *Byrd v. Commonwealth*, 825 S.W.2d 272, 275 (Ky.1992), *overruled on other grounds by Shadowen v. Commonwealth*, 82 S.W.3d 896, 897–98 (Ky. 2002), and *Rogers v. Commonwealth*, 161 Ky. 754, 171 S.W. 464, 467 (1914), do not recite what remark was made by the prosecutor or in what context, thus lend no weight to the majority opinion's conclusion. In *Thompson v. Commonwealth*, 477 S.W.2d 802, 804 (Ky.1972), the defendant interrupted the prosecutor's examination of another witness with extraneous comments to the jury. The prosecutor remarked that the defendant would have an

opportunity to testify if he chose to do so—obviously not a comment on his silence. *Id.* In *Dillard v. Commonwealth*, 995 S.W.2d 366, 372 (Ky.1999), the prosecutor told the jury in closing argument that the defendant lied in his statement to the police. "The focus of the closing argument in that respect was not that Appellant failed to give a statement to the police, but that the statement he gave was untruthful." *Id.* at 373.[2]

In *State v. Ball*, 675 N.W.2d 192 (S.D. 2004), the prosecutor stated, similarly to the prosecutor's statement in this case, that: "the defendant knows what happened, but he's not talking. He's not telling us what happened." *Id.* at 202. In response to arguments identical to those advanced by the Commonwealth in this case, the Court held that the remarks constituted prejudicial error because the prosecutor used the present tense, thereby dispelling any claim that he was referring to the defendant's silence during a previous police interrogation, and referred to "us," thereby dispelling any notion that he was referring to the defendant's refusal to talk to the police. *Id.* at 202–04.

The majority opinion's assertion that any error was cured by the judge's "no adverse inference" instruction is specious. In the first place, the jury was instructed before the prosecutor made his improper comment. Defense counsel did not have an opportunity to remind the jury of the instruction, and the trial court refused to admonish the jury. If a prosecutor makes a statement in closing argument that is contrary to the judge's instruction, the proper recourse is to sustain the objection and give an appropriate admonition to the

jury. *Thomas v. Commonwealth*, 196 Ky. 539, 245 S.W. 164, 166 (1922). The majority's assertion that any error was cured by the prosecutor's "plausible" explanation overlooks the facts that (1) the prosecutor's explanation, though plausible, was inaccurate, and (2) the jury returned to the courtroom during deliberations for the purpose of rehearing Appellant's videotaped confession, at which time they presumably learned for themselves that the prosecutor's "plausible" explanation was inaccurate. Regardless, an "explanation" by an attorney is no substitute for an admonition by the court. *State v. Cassidy*, 236 Conn. 112, 672 A.2d 899, 909 n. 20 (1996), *overruled on other grounds by State v. Alexander*, 254 Conn. 290, 755 A.2d 868, 872 (2000).

The prosecutor's comment on Appellant's failure to testify was intentional and flagrant. His repeated statements that *he* (the prosecutor) did not know whether the shot was fired from under the bush served no purpose except to set the stage for the comment that invited the jury to infer Appellant's guilt from his failure to testify. In *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky.2002), we held:

> [W]e reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:
>
> (1) Proof of defendant's guilt is not overwhelming;
>
> (2) Defense counsel objected; and
>
> (3) The *trial court* failed to cure the error with a sufficient admonishment to the jury.

*Id.* at 568 (emphasis added). Here, the misconduct was both flagrant *and* satisfied

---

**2.** The prosecutor in *Dillard* also directly commented on Dillard's failure to testify, but the remark was rendered harmless because Dillard was not convicted of the offense to which the prosecutor referred at that point. 995

S.W.2d at 374. Furthermore, unlike here, the trial judge gave the jury a curative admonition reminding them of his previous written instruction regarding the defendant's right not to testify. *Id.*

all three of the alternative conditions enumerated in *Barnes*. This violation of Appellant's Fifth Amendment right not to be a witness against himself requires reversal and remand for a new trial.

Accordingly, I dissent.

LAMBERT, C.J., and JOHNSTONE, J., join this opinion.

Concurring opinion by Justice ROACH.

I join Part II, III, IV and V of the majority opinion. For the reasons stated below, I concur in result in Part I and do not join Part VI of the majority opinion.

However, I write separately because I believe that the majority opinion paints too broad of a brush in concluding that comparative bullet lead analysis ("CBLA") evidence could *never* be scientifically reliable and relevant. There is sufficient scientific evidence to support parts of the CBLA analysis so as to allow for limited expert testimony on the subject. The National Research Council of the National Academies of Science (NRC) report, entitled *Forensic Analysis: Weighing Bullet Lead Evidence*,[1] agrees with my conclusion. It states:

> The committee found that CABL [compositional analysis of bullet lead] is sufficiently reliable to support testimony that bullets from the same CIVL [compositionally indistinguishable volume of lead] are more likely to be analytically indistinguishable than bullets from different CIVLs. An examiner may also testify that having CABL evidence that two bullets are analytically indistinguishable increases the probability that two bullets came from the same CIVL, versus no evidence of match status. Recommendation: Interpretation and testimony of

examiners should be limited as described above, and assessed regularly.

> ... Expert witnesses should define the range of CIVLs that could make up the source of analytically indistinguishable bullets because of variability in the bullet manufacturing process. The possible existence of coincidentally indistinguishable CIVLs should be acknowledged in the laboratory report and by the expert witness on direct examination.

> . . .

> It is the conclusion of the committee that, in many cases, CABL is a reasonably accurate way of determining whether two bullets could have come from the same compositionally indistinguishable volume of lead. It may thus in appropriate cases provide additional evidence that ties a suspect to a crime, or in some cases evidence that tends to exonerate a suspect. CABL does not, however, have the unique specificity of techniques such as DNA typing to be used as standalone evidence. It is important that criminal justice professionals and juries understand the capabilities as well as the significant limitations of this forensic technique. The value and reliability of CABL will be enhanced if the recommendations set forth in this report are followed.

*Id.* at 6–7 (emphases removed).

With that said, I do not believe that the CBLA evidence offered in this matter was reliable, thus I concur with Part I of the majority opinion, which holds that the admission of this evidence constituted reversible error.

Because I continue to believe that this Court should not address issues that are

---

1. The National Research Council of the National Academies of Science, *Forensic Analysis: Weighing Bullet Lead Evidence* (2004),

*available at,* http://www.nap.edu/books/0309090792/html/.

not likely to recur upon retrial I do not join Part VI of the majority opinion. *See Dickerson v. Commonwealth,* 174 S.W.3d 451, 473–74 (Ky.2005) (Roach, J., Concurring) ("However, because there is no likelihood that the jury issues, as discussed in Part III.C., will be present at retrial, I do not believe that we should address them. *See Ice v. Commonwealth,* 667 S.W.2d 671, 680 (Ky.1984) ('Since we have reversed this case for the reasons previously given, we will not discuss the other points raised by appellant inasmuch as they are unlikely to recur on retrial of this case.'); *Terry v. Commonwealth,* 153 S.W.3d 794, 797 (Ky. 2005) ('We will also address other issues that are likely to recur upon retrial.').")). During closing argument on retrial of this case, it is unlikely that the prosecutor will make a statement similar to the one presently at issue. Therefore, we should not address whether the statement made by the prosecutor constituted reversible error.

Dissenting opinion by Justice WINTERSHEIMER.

I respectfully dissent from that part of the majority opinion which reverses the judgment of conviction. The trial judge did not abuse his discretion by admitting evidence of the comparative bullet lead analysis conducted by the F.B.I. The due process rights of Ragland under both the United States and Kentucky Constitutions were not violated by the trial judge when he denied a motion for a new trial based on the newly discovered evidence of perjured testimony given by the F.B.I. laboratory analyst. The perjured testimony did not affect the outcome of the trial. The trial judge did not violate the constitutional due process rights of Ragland by admitting evidence of other Wetherby Vanguard rifles.

The trial judge did not abuse his discretion by admitting evidence of the comparative bullet lead analysis conducted by the F.B.I. Pursuant to a pretrial motion in limine, the trial judge conducted an evidentiary hearing following the directions of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Mitchell v. Commonwealth,* 908 S.W.2d 100 (Ky.1995).

The trial judge properly permitted the expert testimony by the F.B.I. analyst for the prosecution that comparative bullet lead analysis indicated that the composition of the fatal bullet was analytically indistinguishable from the unspent cartridges found in Ragland's residences and that all the bullets could have had a common manufacturing source. She did not testify that the bullet and the cartridges came from the same source.

The trial judge determined that the comparative bullet lead analysis given by the F.B.I. expert had a scientific basis which met the requirements of KRE 702 and KRE 104(a). Such an analysis had been performed on a routine basis only by the F.B.I. laboratory. The opinion of a retired F.B.I. agent employed by the defense, the rebuttal expert, agreed in large measure with the original testimony of the F.B.I. The only real difference between the two expert testimonies was that Ragland's expert emphasized that, while the murder bullet and Ragland's unspent cartridges could have had a common lead source, they also could have come from different sources. As such this is not a scientific difference but only a difference in emphasis. In addition, other jurisdictions have acknowledged the scientific validity of comparative bullet lead analysis. *Cf. United States v. Davis,* 103 F.3d 660 (8th Cir., 1996) and *State v. Noel,* 157 N.J. 141, 723 A.2d 602 (1999), which noted various cases on the subject.

The trial of this case occurred in March 2002. Since that time, the defense expert Tobin as well as others have criticized the conclusion of the comparative bullet lead analysis such as those presented in this case. The scientific dispute has raged for a number of years. On September 1, 2005, following a 14–month review of the findings and recommendations of the National Research Council of the National Academies of Science, the F.B.I. indicated that it would no longer conduct comparative bullet lead analysis tests. There continues to be a scientific and legal debate about the sufficiency of the evidence to support parts of the comparative bullet lead analysis as noted in the concurring opinion by Justice Roach. He believes that the evidence offered here was not scientifically reliable. However, I must respectfully disagree.

The trial judge did not abuse his discretion in admitting the evidence. There was no violation of the rights of Ragland under the due process clause of the Fifth and Fourteenth Amendments to the U.S. Constitution or Section 11 of the Kentucky Constitution.

The due process rights of Ragland under the United States and Kentucky Constitutions were not violated by the trial judge when he denied a motion for new trial based on the newly discovered evidence of perjured testimony given by the F.B.I. laboratory analyst. There was no abuse of discretion or error by the trial judge.

The perjured testimony did not affect the outcome of the trial. The perjury occurred at a pretrial hearing when the expert for the Commonwealth testified that the Winchester ammunition plant had changed its bullet manufacturing process in 1996, when in fact, the change occurred in 1994. Only the trial judge, and not the jury, heard the perjury during the *Daubert* hearing. The trial judge found that

the perjury related only to a collateral or background fact and that his *Daubert* ruling had not been affected by the perjury. The expert for Ragland, relying only on the correct dates, reached essentially the same conclusion as the expert for the prosecution. Therefore, the deliberations and the verdict could not have been directly affected by the perjury.

In a situation where perjured testimony is introduced without the knowledge of the prosecutor, the use of the perjury is treated like newly discovered evidence and a new trial is proper only if the newly discovered evidence is of "such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably change the result if a new trial should be granted." *See Commonwealth v. Spaulding*, 991 S.W.2d 651 (Ky.1999). In this case, Ragland has failed to demonstrate that the *Daubert* hearing perjury affected the outcome of the case. The perjury did not relate to a controlling fact and did not have any impact on the pretrial ruling to admit the bullet analysis.

The trial judge did not violate the due process rights of Ragland under the United States and Kentucky Constitutions by admitting evidence of other Wetherby Vanguard rifles. The trial judge permitted evidence regarding ballistics tests performed on three other .243 Wetherby rifles from Ohio because the results of these tests, when considered together with the results of ballistics tests performed on Ragland's .243 Wetherby rifle helped show the jury that Ragland had the means to commit the murder. The firearms examiner testified that markings on test bullets fired from Ragland's .243 Wetherby matched markings on a fragment of the bullet that killed the victim. He qualified this opinion by stating that he could not conclusively match the samples because of the fragmentation of the fatal bullet. The

examiner then testified he was able to rule out a match between the fatal bullet and test bullets fired from three Wetherby rifles from Ohio. Those rifles were apparently manufactured at or about the same time as the rifle seized from the residence of Ragland's mother. The purpose of this testimony was that it showed that Ragland's rifle could have been the murder weapon. The evidence was relevant and any prejudicial effect did not outweigh its probative value. The jury was not confused or misled by the testimony. There was no abuse of discretion. *Cf. Simpson v. Commonwealth*, 889 S.W.2d 781 (Ky. 1994).

A review of the evidence in the record requires that the conviction should be affirmed in all respects.

GRAVES, J., joins.